[No. 1647.]

## EX PARTE WILLIAM G. BOYCE.

EIGHT-HOUR LAW — CONSTITUTIONALITY — STATUTES—EXPEDIENCY — POWER OF COURTS.

1. The act of February 23, 1903 (Stats. 1903, p. 33, c. 10), providing an eight-hour day for workingmen in mines, smelters, and mills for the reduction of ores, is not void, under section 1 of article I of our state constitution, guarantying to citizens the right to acquire and possess property; nor is the statute in conflict with section 21 of article IV, which provides that, in all cases where a general law can be made applicable, all laws must be general and of uniform operation throughout the state.

2. Nor is the act mentioned inimical to the fourteenth amendment to the federal constitution, which provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life or liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law."

3. The people, and through them the legislature, have supreme power in all matters of government where not prohibited by constitutional limitations, and, while the powers of the federal government are restricted to those delegated, those of the state government embrace all that are not forbidden.

4. All acts of the legislature are presumed to be valid until it is clearly shown that they violate some constitutional restriction.

5. The legislature has inherent authority, under the general police power of the state, to enact laws for the promotion of the health, safety, and welfare of the people, and its arm cannot be stayed when exercised for these purposes.

6. If the restriction of the hours of labor be deemed a regulation or limitation on the right to acquire property, the occupations to which the act applies are not considered healthful; and it was therefore within the power and discretion of the legislature to enact the statute for the protection of the health and prolongation of the lives of the workingmen affected, and the resulting welfare of the state.

7. Questions relating to the wisdom, policy, and expediency of statutes are for the people's representatives in the legislature assembled, and not for the courts, to determine.

BELKNAP, C. J., dissenting.

(Syllabus by the Court.)

ORIGINAL PROCEEDING. In the matter of the application of William G. Boyce for writ of *habeas corpus*. **Writ denied.**

The facts sufficiently appear in the opinion.

*F. M. Huffaker*, for Petitioner:

I. This is an original proceeding in this court wherein petitioner challenges the legality of his imprisonment in the

county jail of Lyon county, by the sheriff of said county, pursuant to a judgment of the justice of the peace of Silver City township in an action tried by said justice, wherein the State of Nevada is plaintiff and petitioner is defendant. Said action was tried by said justice, and judgment rendered therein on the 5th day of August, 1903, and on said day, pursuant to said judgment, the petitioner was imprisoned in the county jail of Lyon county by the sheriff thereof. Petitioner having at the trial challenged the constitutionality of the act of the legislature of the State of Nevada under which said action was brought, and under which he was tried, convicted and imprisond, applied for and obtained a writ of *habeas corpus*, on the ground that his said conviction and imprisonment are illegal because the said act of the legislature of the State of Nevada is unconstitutional and void, which is the question to be now determined. (*Ex Parte Rosenblatt*, 19 Nev. 439.)

II. The act of the legislature of the State of Nevada, under which defendant was convicted and imprisoned, and the constitutionality of which is called in question by this proceeding, is entitled "An act regulating the hours of employment in underground mines and smelters, and ore reduction works, and providing penalties for violation thereof," approved February 23, 1903, popularly known as the "Eight-Hour Law."

Said act provides as follows: "SECTION 1. The period of employment of working men in all underground mines or workings shall be eight (8) hours per day, except in cases of emergency where life or property is in imminent danger."

So far as this proceeding is concerned, this is the only section involved, for if the legislature has power to enact this section into law, then the punishment prescribed for the violation is unquestioned.

Can our legislature, under the constitution, enact any such law?

The first section of the first article of our state constitution declares "All men are by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining

safety and happiness." This article is our "Bill of Rights," and any right embraced therein pertaining to the citizen cannot be limited, abridged, or interfered with by the legislature.

III. Petitioner also challenges the act of our legislature under which he was convicted as being repugnant to section 17 of article IV of our constitution, as embracing two subjects, and especially repugnant to section 20 of said article IV, being class legislation.

What has been the adjudication of the courts upon this eight-hour legislation? I observe, preliminarily, that the constitutionality of a statute of a state is determined by the constitution of the state, and that decisions of other states, upon constitutional provisions, which are not in our constitution, are not authority in determining the constitutionality of an act of this state, but where there is a common provision in the constitutions of different states, adjudications thereon are valuable assistants in the investigation of principles.

I first call attention to *Ex Parte Kubach*, 24 Pac. Rep. 737, by the Supreme Court of California, August 4, 1890, where the court say: "This is an application for a writ of *habeas corpus*. The petitioner was tried and convicted of a misdemeanor under the following ordinance of the city of Los Angeles: 'The Mayor and the Council of the City of Los Angeles do ordain as follows: Sec. 1. Eight hours labor constitute a legal day's work in all cases where the same is performed under the authority of any ordinance, resolution or contract of the city, etc.' It is claimed in support of the petition, that this ordinance is unconstitutional and void. We think that this objection is well taken. It is simply an attempt to prevent certain parties employing others in a lawful business and paying them for their services, and is a direct infringement of the right of such persons to make and enforce their contracts. If the services to be performed were unlawful, or against public policy, or the employment were such as might be unfit for certain persons, as, for example, females or infants, the ordinance might be upheld as a sanitary or police regulation, but we cannot conceive of any theory upon which a city could be justified in making it a misdemeanor for one of its citizens to contract with another

for services to be rendered because the contract is that he shall work more than a limited number of hours per day. Mr. Cooley in his work on Constitutional Limitations (5th ed. 745) says: 'The general rule undoubtedly is that any person is at liberty to pursue any lawful calling, and to do so in his own way, not encroaching upon the rights of others. This general right cannot be taken away. It is not competent, therefore, to forbid any person, or class of persons, whether citizens or resident aliens, offering their services in lawful business, or to subject others to penalties for employing them. But here, as elsewhere, it is proper to recognize distinctions that exist in the nature of things, and render some circumstances to inhibit employments to some one class by leaving them open to others. Some employments, for example, may be admirable for males and improper for females, and regulations recognizing the impropriety, and forbidding women engaging in them, would be open to no reasonable objection. The same is true of young children whose employment in mines and manufactories is commonly and ought always to be regulated. And some employments in which integrity is of vital importance, it may be proper to treat as privileges merely, and to refuse the license to follow them to any one who are not reputable.' For these reasons, we hold the ordinance, so far as it attempts to create a criminal offense, to be void, and that the petitioner should be discharged."

The same principle applies to a statute as to an ordinance.

IV. I next call attention to a case entitled "*In re Eight-Hour Law*," arising under that special provision of the constitution of Colorado authorizing the general assembly to take the opinion of the supreme court upon the constitutionality of a proposed law. In answer to interrogatories thus propounded, the Supreme Court of Colorado, on February 21, 1895, returned the following opinion:

"*Per Curiam*: It is not competent for the legislature to single out the mining, manufacturing and smelting industries of the state, and impose upon them restrictions with reference to the hours of their employees, from which other employers of labor are exempt. An act such as proposed would manifestly be in violation of the constitution against

class legislation. The bill submitted also violates the right of parties to make their own contracts—a right guaranteed by our bill of rights, and protected by the fourteenth amendment to the constitution of the United States. (See opinion recently rendered upon *In re House Bill No. 203*, 39 Pac. 431.) For an able and comprehensive exposition of the constitutional provisions applicable to the subject, your attention is invited to the recent case of *Low* v. *Printing Co.*, 41 Neb. 59 N. W. 362."

V. The next decision is what is known as the Utah case, decided October 29, 1896, entitled *Holden* v. *Hardy, Sheriff*, 46 Pac. 756. The opinion was delivered by C. J. Zane, and is by him specially based upon the constitution of Utah, and upon that particular provision, being in section 6 of article XVI, which is: "And the legislature shall pass laws to provide for the health and safety of employees in factories, smelters and mines." Under the constitutional provision, the court held an eight-hour law valid, but a complete answer to this is, the Nevada constitution has no such provision. And as fully sustaining this proposition, I call attention to the decision following thereafter, upon the constitutionality of an eight-hour law, decided November 13, 1899, by the Supreme Court of Colorado, entitled *In re Morgan*, 58 Pac. 1071, the statute being almost word for word of the Nevada statute of February 23, 1903, and as the case was fully and ably presented by eminent counsel, and carefully considered by the court, and the reasoning clear, I quote at some length:

"The petitioner challenges the validity of the statute as inhibited by the foregoing clauses of the organic law. [Similar to the challenge in this proceeding.] The position of the attorney-general is, that it was passed as a health regulation, and may be vindicated as coming within the range of the police powers of the state. Four years before it became an act, this court, to an inquiry of the house of representatives of the tenth general assembly, as to the constitutionality of a bill reading 'Eight hours shall constitute a legal day's work for all classes of mechanics, workingmen and laborers, employed in any mine, factory or smelter of any kind whatever in the State of Colorado,' replied that it was 'not competent for the legislature to single out the min-

ing, manufacturing and smelting industries of the state, and impose upon them restrictions with reference to the hours of their employees, from which other employers of labor are exempt,' and it was further said that the section 'violates the right of parties to make their own contracts—a right guaranteed by our Bill of Rights.' (*In re Eight-Hour Bill*, 21 Colo. 29, 39 Pac. 328.)

"The twelfth general assembly must have been aware of this, and another decision concerning the power of the legislature to pass what is called a 'Coal Screening Bill'—the opinion being reported in 21 Colo. 27, and 39 Pac. 431 (*In Re House Bill 203*)—in which this species of legislation was condemned as hostile to the constitution. But, wholly disregarding these decisions, binding alike on all departments of government, it proceeded to enact the measure now before us. Though it affords no justification for such legislative action in defiance and against the solemn decision of this court, we presume that the excuse might be offered therefor that, after these decisions were handed down, in a sister state an act in the same language was passed and approved by its court, and, as is claimed, sanctioned by the Supreme Court of the United States. Following the rule of *stare decisis*, we might content ourselves with a mere affirmance of our previous announcements, made as they were upon full consideration; but, in view of the importance of the questions involved, we have thought it best to fully discuss the principles by which this act must be tested.

"The question presented for our determination is, does the act under which petitioner is being prosecuted violate any constitutional provision? In this resolution the provisions of our own constitution must govern. Decisions of other jurisdictions, defining the limits of legislation under their constitutions, are not always to be followed elsewhere upon the supposition that the same limitations everywhere prevail. This is illustrated in the answer of the judges of the Supreme Judicial Court of Massachusetts, in response to an inquiry by the house of representatives as to the validity of a proposed bill. In the course of the opinion, after referring to the fact that legislation similar to that proposed had been held by the courts of some states unconstitutional on dif-

ferent grounds, and without expressing an opinion as to the correctness of those decisions tested by the respective constitutions, the honorable judges said: 'The legislative power granted to the general court by the constitution of Massachusetts is perhaps more comprehensive than that found in the constitutions of some other states.' (*In re House Bill No. 1230*, 163 Mass. 590.) A similar observation was made by the Supreme Court of Illinois in the Ritchie case, 155 Ill. 98. It is peculiarly appropriate, we think, to our organic act. A comparison of many other constitutions with ours, shows that the latter probably contains more restrictions upon the power of the legislature than are to be found in any other instrument; and whether measured by the decisions of the court of that state, or as the result of our own construction, we think it clear that the General Court of Massachusetts has, in the field of legislation under review, much wider latitude, and is hampered by fewer restrictions, than is our general assembly.

"The extent and meaning of the act in question are not difficult of ascertainment, though it is not a model statutory composition. That it operates as a limitation both upon the employer and the employee, seems clear. It forbids a certain kind of employment. There can be no employment without the concurring acts of him who contracts for employment, and of him who contracts to be employed. Both are within the inhibition of the enactment, and, if it is valid, each is liable for making the forbidden contract. The petitioner, therefore, as a laboring man, is prohibited from entering into a contract to work in a smelter more than eight hours in any one day. If, in our constitution, there was, as there seems to be in that of Utah, a specific affirmative provision enjoining upon the general assembly the enactment of laws to protect the health of the classes of workmen therein enumerated, it might be that acts reasonably appropriate to that end would not be obnoxious to that provision of our constitution forbidding class legislation; for it could hardly be said that a classification made by the constitution itself was arbitrary or unfair, or that it clashed with another provision of the same instrument inhibiting class legislation. The two provisions should be construed together so as to harmonize,

if that be possible under sound canons of construction, and the general clause forbidding class legislation might be regarded as qualified by the special one which authorizes such legislation in respect to the enumerated classes.

"Article XVI of our constitution is devoted to mining and irrigation, and section 2 directs that 'the general assembly shall provide by law for the proper ventilation of mines, the construction of escapement shafts, and such other appliances as may be necessary to protect the health and secure the safety of the workmen therein.'

"These regulations manifestly embrace only such reasonably necessary mechanical appliances as will secure the end in view, and do not include other kinds of health regulations. Whether this command addressed to the legislature to protect the health of these workmen by requiring the mines to be furnished with the appliances specified does not restrict the lawmaking power to the things named, on the principle that when authority to do a particular thing is given, and the mode of doing it is prescribed, all other modes are excluded, might be a material inquiry, where the validity of the act was challenged by a miner; but as that question relates to workmen in mines and not in smelters, we prefer to put our decision upon impregnable grounds that cover both cases.

"Be that as it may, we have no constitutional provision which authorizes the legislature to single out workmen in underground mines and smelters, and impose upon them restrictions as to the number of hours they shall work at these industries from which workmen in all other departments of industry are exempt. To this effect is our decision *In re Eight-Hour Bill, supra;* and we have heard no argument in the case at bar, nor have we been cited to any authority, that leads us to a different conclusion.

"The act is equally obnoxious to the provisions of our bill of rights set out in the statement, which guarantees to all persons their natural and inalienable right to personal liberty, and the right of acquiring, possessing and protecting property. Liberty means something more than mere freedom from physical restraint. It includes the privilege of choosing any lawful occupation for the exercise of one's physi-

cal and mental faculties, which is not injurious to others.

"The right to acquire and possess property includes the' right to contract for one's labor. The latter is essentially a property right. The arbitrary classification of rights into rights of persons and rights of things made by Blackstone and other jurists for purposes of convenience in treatment has been the occasion for hostile criticism by those favoring socialistic or paternal legislation. Employing the *argumentum ad hominem*, they say that those decisions in which courts have carefully guarded rights of property put property above the man. A moment's calm reflection will show the falsity of this charge. Property, as such, has no claim upon the law for protection. When a property right is spoken of, the right of some person over or concerning the property is meant. All rights recognized by the law pertain to persons, natural or artificial.

"The absolute rights are commonly designated as personal rights. They are such as are annexed to the person, like life and reputation; while property rights are those unconnected with the person, but which none the less belong to some person.

"All rights, both those spoken of as personal, and those denominated as property rights, belong to the individual citizen; and when it is said that property rights must not be infringed, what is meant is merely that the right of' some person to or concerning property must not be interfered with. That this act infringes both the right to enjoy liberty and to acquire and possess property, seems too clear for argument. While conceding that this limitation is not permissible, counsel for respondent, as we understand them, recognize the fact (but if they do not, the same is only too apparent) that those natural rights are violated by the provisions of the act. The limitation is claimed to be warranted on the ground that these and all other constitutional guarantees must yield to the paramount and sovereign right of the state to exercise its police power to protect the public health; and to this, the principal question in this proceeding, we now address ourselves. * * * It is difficult to define, or with precision to describe, the police power. It has rarely been attempted by the courts, and the attempt has never

been attended with complete success. Following the authorities, we may say that it extends to the protection of the public health. It is upon the specific ground that limiting the time a workman may labor in a smelter to eight hours a day conduces to and preserves the health of the laborer himself, that this act is sought to be upheld. With sincere respect for the ability of the courts in whose opinions the remarks are found, but with a profound conviction of their erroneous conception of the nature and limits of the police power, we submit that much loose reasoning has been indulged in, and some decisions rendered that cannot be defended upon principle.

"As we understand it, the 'police power' is the name given to that function of government by which is enforced the maxim '*sic utere tuo ut alienum non lædas.*'

"In Cooley's Const. Lim. (6th ed.) 208, we read that this maxim 'is that which lies at the foundation of the power.' Professor Tiedeman in his work on the Limitations of the Police Power, in section 1, says: 'The object of government is to impose that degree of restraint upon human actions which is necessary to the uniform and reasonable conservation and enjoyment of private rights. * * * The conservation of private rights is attained by the imposition of a wholesome restraint upon their exercise, such a restraint as will prevent the infliction of injury upon others in the enjoyment of them.' He further quotes with approval the language of Judge Redfield in the case of *Thorpe* v. *Railroad Co.*, 27 Vt. 140: 'This police power of the state extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the state, according to the maxim "*sic utere tuo ut alienum non lædas,*" which, being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' And Professor Tiedeman immediately follows this quotation with the statement that: 'Any law which goes beyond that principle—which undertakes to abolish rights the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public

welfare and the general security—cannot be included within the police power of the government.'

"It thus appears that in proceeding under this power, the legislature must choose proper subjects for its exercise, and must observe constitutional limitations just as closely as when it enacts laws pertaining to the public revenue, or provides for the exercise of the power of eminent domain.

"In our form of government, unlimited power does not exist in any department (Prent. Police Powers, 267; *Loan Assn.* v. *Topeka*, 20 Wall. 655), and whenever the constitutionality of an act of any department is challenged, the judicial department is the final arbiter.

"Notwithstanding this general rule, we are here met with the argument, and the assertion is baldly made, that in the exercise of its police power, the legislature is subject to no restriction except its own unbridled discretion as to what subjects it may select for regulation, and the kind of regulation it may prescribe. We cannot assent to this doctrine. It may find apparent sanction in unguarded expressions of text-writers or in judicial opinions, but it is contrary to every well-considered decision. It is for the legislature to determine the exigency (that is, the occasion) for the exercise of the power; but it is clearly within the jurisdiction of the courts to determine what are the subjects upon which the power is to be exercised, and the reasonableness of that exercise. (Tied. Lim. Police Powers, sec. 3; *People* v. *Jackson & M. Plank Road Co.*, 9 Mich. 285; *Town of Lake View* v. *Rose Hill Cemetery Co.*, 70 Ill. 191; 18 Am. & Eng. Ency. Law, 746, *et seq.; People* v. *Gillson*, 109 N. Y, 389.)"

VI. As far as I have had time to verify, outside the Utah cases, the decisions that might be considered as leaning that way are *Com.* v. *Hamilton Mfg. Co.*, 120 Mass. 383, but which seems to be nullified by *Com.* v. *Perry*, 155 Mass. 117, and *State* v. *Peel Splint Co.*, 36 W. Va. 802.

While beside the Colorado cases there are those that hold eight-hour legislation is not within the police powers of a state, and is special legislation, and therefore unconstitutional. (*Ex Parte Kubach*, 85 Cal. 274; *Low* v. *Rees Printing Co.*, 41 Neb. 127.)

Where the court say such an act is unconstitutional—First,

because it is special legislation; second, it denies the right of contract: *Millett* v. *People*, 117 Ill. 294; *Frorer* v. *People*, 141 Ill. 171; *Ritchie* v. *People*, 155 Ill. 98; *In re Jacobs*, 98 N. Y. 98; *Leep* v. *Railway Co.*, 58 Ark. 407; *State* v. *Loomis*, 115 Mo. 307; *Godcharles* v. *Wigeman*, 113 Pa. St. 431; *State* v. *Goodwill*, 33 W. Va. 179; *People* v. *Warden, etc.*, 157 N. Y. 116; *State* v. *Julow*, 129 Mo. 163, referred to by Judge Caldwell *In re Morgan, supra*.

After these came those in Washington of *City of Seattle* v. *Smyth*, 60 Pac. 1120, where the court say, speaking of eighthour statutes and ordinances: "The principle upon which they are held to be unconstitutional is, that they interfere with the constitutional righs of persons to contract with reference to compensation for their services, where such services are neither unlawful nor against public policy, nor the employment such as might be unfit for certain classes of persons, as females and infants.

"Every person *sui generis* has a right to make use of his labor in any lawful employment, on his own behalf or to hire it out in the service of others. This is one of the first and highest of civil rights." (Cooley on Torts (2d ed.) 326, and citing *In re Morgan, supra; Ex Parte Kubach, supra; Low* v. *Printing Co., supra.*)

Evidently this court did not consider the Utah case as bearing upon the proposition.

VII. From the foregoing it seems clear that the act in question is violative of the constitution of the State of Nevada, in that it abridges the right of private contract, and is class legislation, unless it is a valid exercise of the police power of the state.

*James G. Sweeney*, Attorney-General, *H. F. Bartine*, *F. P. Langan*, and *John H. Murphy*, for the State:

I. Petitioner in the above case seeks to avoid the judgment of the lower court, wherein he was convicted of having contracted with and caused a miner to work in his underground mine for a period of ten hours in one day, when there was neither life nor property in imminent danger in his said mine.

The law of Nevada which he violated is "An act regulat-

ing the hours of employment in underground mines and smelters and ore reduction works, and providing penalties for the violation thereof," approved February 23, 1903.

Arizona, Montana and Utah have acts relating to the hours of labor in mining, milling and smelting, which are identical with the Nevada act; and, inasmuch as the Supreme Court of Utah has passed on the constitutionality of that act, and to show that it is the same as that of Nevada, we set the two acts in parallel columns:

### Nevada Statute.

An Act regulating the hours of employment in underground mines and smelters and ore reduction works, and providing penalties for violation thereof.

Section 1. The period of employment of working men in all underground mines or workings shall be eight hours per day except in cases of emergency where life or property is in imminent danger.

Sec. 2. The period of employment of working men in smelters and in all other institutions for the reduction or refining of ores or metals shall be eight hours per day except in cases of emergency where life or property is in imminent danger.

Section 3 provides a penalty for the violation of sections 1 and 2.—Stats. Nev. 1903, p. 33.

### Utah Statute.

An Act regulating the hours of employment in underground mines and in smelting and ore reduction works.

Section 1. The period of employment of working men in all underground mines or workings shall be eight hours per day except in cases of emergency where life or property is in imminent danger.

Sec. 2. The period of employment of working men in smelters and all other institutions for the reduction or refining of ores or metals shall be eight hours per day except in cases of emergency where life or property is in imminent danger.

Section 3 provides a penalty for the violation of sections 1 and 2.—Session Laws Utah, 1896, p. 219.

II. *Rules of Construction:* In taking up grave and important constitutional questions, it is essential that recurrence be had to some of the fundamental principles which underlie their determination by the courts, and we therefore submit authorities on that point first.

"A statute can only be declared unconstitutional where specific restrictions upon the power of the legislature can be pointed out and the case shown to come within them, and not upon any general theory that the statute is unjust or oppressive or impolitic, or in conflict with a spirit supposed to pervade the constitution, but not expressed in words." (*Sawyer* v. *Dooley*, 21 Nev. 390; 32 Pac. 437.)

Under the decisions of this court no act of the legislature will be declared unconstitutional if there is a fair and

reasonable doubt as to its constitutionality.   (*Ash* v. *Parkinson*, 5 Nev. 23;  *Clark* v. *Irwin*, 5 Nev. 120;  *Evans* v. *Job*, 8 Nev. 337; *State* v. *Comrs. Humboldt Co.*, 21 Nev. 238; *State* v. *Westerfield*, 24 Nev. 37.)

Authorities need not be cited in support of the proposition that he who asserts the unconstitutionality of a statute must establish beyond a reasonable doubt the conflict or inconsistency which renders it void; it is not enough for him to vaguely insist that the act questioned is obnoxious to some unexpressed intent or spirit supposed to pervade the constitution; *he must point out the specific provision or provisions of that instrument transgressed.*  To the same effect see *Denver* v. *Knowles*, 17 Colo. 204.

"The right of the judiciary to declare a statute void and to arrest its execution is one which, in the opinion of the court, is coupled with a responsibility so grave that it is · never to be exercised except in very clear cases.  One department of the government is bound to presume that another has acted rightly.  *The party who wishes us to pronounce a law unconstitutional* takes upon himself the *burden of proving beyond a doubt* that it is so."  (*Erie R. R. Co.* v. *Casey*, 26 Pa. St. 287; *Powell* v. *Com.*, 114 Pa. St. 270.)

"It has been truly said that the presumption is in favor of every legislative act, and the whole burden of proof lies on him who denies its constitutionality."  (Marshall, C. J., in *Brown* v. *Maryland*, 12 Wheat. 436.)

"It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which a law is passed, to presume in favor of its validity, until its violation of the constitution is *proved beyond all reasonable doubt.*"  (*Ogden* v. *Saunders*, 12 Wheat. 270.)

"Only when it violates the constitution *clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation in our minds.*"   (*Sharpless* v. *Mayor*, 59 Am. Dec. 782.)

"Every statute is presumed to be constitutional.  The courts ought not to declare one to be unconstitutional unless it is clearly so.  If there is doubt, the expressed will of the legislature should be sustained."   (*Munn* v. *Illinois*, 94 U. S. 126.)

To the same effect and approving the above language are the following:   *State* v. *Coal Co.*, 36 W. Va. 835–838; *Penn. R. R.*

v. *Riblet*, 66 Pa. St. 164; *University* v. *Barnard*, 57 Cal. 612; *Sinking Fund Cases*, 99 U. S. 718; *State* v. *Ah Chew*, 40 Am. Rep. 490; *Fletcher* v. *Peck*, 6 Cranch. 87; *Ah Lim* v. *Territory*, 1 Wash. St. 159; *State* v. *Addington*, 77 Mo. 110; *State* v. *Laughlin*, 75 Mo. 147; *Humes* v. *Railway*, 82 Mo. 230–232; *Leep* v. *Railway*, 58 Ark. 414–415; *Newland* v. *Marsh*, 19 Ill. 385.

III.   That the law may seem unreasonable, oppressive or absurd, or that there may be objections to its policy or expediency, is not sufficient to justify its judicial repeal.   These are matters for which the legislature must shortly answer to its constituents who can correct them.   It must be in direct conflict with some expressed prohibition of the constitution. (*Mayor of New York* v. *Miln*, 11 Pet. 138; Cooley on Const. Lim. 164; *Nathan* v. *Alabama*, 8 How. 73; *Passenger Cases*, 7 How. 287, 402; *Sharpless* v. *Mayor*, 21 Pa. St. 147, 161–2; *Patterson* v. *Yuba*, 13 Cal. 175–172; *Leonard* v. *Wiseman*, 31 Md. 201; *Com.* v. *McWilliams*, 11 Pa. St. 61–70; *Davis* v. *State*, 3 Lea. 376; *Varrick* v. *Smith*, 5 Paige, 160; *Williams* v. *Commack*, 27 Miss. 209; *Ah Lim* v. *Territory*, 1 Wash. St. 162; *People* v. *Gillson*, 109 N. Y. 406.)

IV.   *Petitioner's First Contention:* Petitioner asserts that the Nevada eight-hour law violates section 1 of article I of the constitution of the State of Nevada.   The provision which he alleges is violated is similar to that found in the constitutions of various states which have upheld laws regulating the hours of employment.   For the purpose of making a single comparison we will place the article of the Nevada constitution, which is said to be violated, side by side with an article in the Utah constitution:

|  *Nevada Constitution.*  |  *Utah Constitution.* |
|---|---|
| Section 1 of Article I: "All men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and pursuing and obtaining safety and happiness." | Section 1 of Article I: "All men have the inherent and inalienable right to enjoy and defend their lives and liberty, and to acquire and possess and protect property," etc. |

There are several sections also in the constitution of the United States which manifestly mean the same as that found

in the declaration of rights of the Nevada constitution, among which are as follows:

Article I, Section 10:  "No state shall * * * pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility."

Article IV:  "The citizens of each state shall be entitled to all of the privileges and immunities of the citizens of the several states."

Article V of the Amendments to the Constitution:  "* * * Nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

Article XIV of the Amendments, Section 1:  "* *, * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."

V.  Counsel for petitioner in his argument has not pointed out any provision of the constitution of this state which has been violated, but his theory is, that the language found in article I, section 1 thereof, by inference, is a limitation upon the legislature, and therefore the legislature is powerless to enact any law which would prevent men from contracting with one another concerning the hours of labor, although in the argument of both counsel for the petitioner it was admitted that the legislature had power to step in and prevent men from being exposed to unusual dangers, and as an example thereof they cited that the legislature of this state had compelled mining companies to provide a top or cover for cages to prevent rocks which might fall down the shaftway from striking and killing the miner in a cage.  This admission upon the part of both of the eminent gentlemen, attacking the validity of the law, in itself destroys the entire force of their contentions, wholly and entirely, with respect to the right of the legislature to enact the law in question, which is obviously to protect the health and safety of men working in mines and smelters.

It is certainly inconsistent and absurd to hold that a law is constitutional requiring a cage to be so equipped with a

cover for the purpose of protecting the individuals against those occurrences which would produce instant death, and at the same time to hold that a law is unconstitutional which protects the very same class of individuals from a more slow, but nevertheless just as sure, agency of death as the falling of rocks and other missiles upon them. Is he less guilty of murder who periodically administers a small dose of poison, which will in due time kill the victim, than he who administers a lethal dose from the effects of which the victim immediately dies? Is it possible that the state has power to prevent the thing which would produce instant death to the individual, and is powerless to prevent all the things that operate to impair his physical power, incapacitate him from earning a living, and prematurely produce death, or, owing to a weakened condition from being in contact at too long periods of time with noxious conditions, be so enfeebled as not to be able to sufficiently look out for his own safety, or the safety of others who might be dependent upon his vigilance? Is it possible that the state in one instance can enact a law preventing one from causing the instant death of his employee, but that it must be silent, helpless and impotent when it comes to protecting that person from the same employer who keeps his helpless victim in a place so long each day that his system becomes inoculated and filled with the germs of disease, which prematurely produce death as certainly as the more direct and violent cause?

VI.   On the subject of police powers this court has said: "Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizen and to the preservation of good order and the public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, '*Salus populi suprema est lex*'; and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion may be no more bargained away than the power itself. All rights are held subject to

the police power of the state.  If the public safety or the
public morals require the discontinuance of any manufacture
or traffic, the hand of the legislature cannot be stayed from
providing for its discontinuance by an incidental inconve-
nience which individuals or corporations may suffer."   (*In
the Matter of the Application of W. L. Wallace* v. *The Mayor
and City Council of Reno.*)

"All authorities agree that the constitution presupposes
the existence of the police power and is to be construed with
reference to that fact."   (*Village of Carthage* v. *Frederick*,
122 N. Y. 273.)

Mr. Sedgwick, in his work on Constitutional Law, says:
"That the clause providing the taking of property without
compensation is not intended as a limitation of the exercise
of the police powers, which are necessary to the tranquillity
of every well-ordered community, *nor of the general power
over private property*, which is necessary for the orderly
existence of all governments.  It has always been held that
the legislature may make police regulations, although they
may interfere with the full enjoyment of private property,
and though no compensation is given."   (Sedgwick on Statu-
tory Const. Law, 435.)

A recent writer on limitations of the police power says:
"Where the letter of the constitution would prohibit police
regulations, which by all the principles of constitutional
government have been recognized as beneficial and *permis-
sible restrictions* upon the individual liberty of action, such
regulations will be upheld by the courts on the grounds that
the framers of the constitution could not possibly have
intended to deprive the government of so salutary a power,
and hence the spirit of the constitution permits such legisla-
tion, although a strict construction of the letter prohibits."
(Tiedeman's Limitations of Police Powers, 12, cited and
approved in *Village of Carthage* v. *Frederick*, 122 N. Y. 274.)

"The police powers comprehend all those laws of internal
regulation necessary to secure peace, good order, health and
comforts of society."   (*Ex Parte Schrader*, 33 Cal. 279; *Beer
Co.* v. *Mass.*, 974 U. S. 25.)

"The police power of a state extends to the protection of
the lives, health and property of the citizen, and to the pres-

ervation of good order and public morals." (*Boyd* v. *Alabama*, 94 U. S. 645.)

"State laws may impose reasonable police regulations for the protection of markets against a sale of commodity unfit for commerce." (*State* v. *Fosdick*, 21 La. Ann. 2256; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 669.)

Also a state may provide a law prohibiting the manufacture or sale of oleomargarine and similar substances. (*Butler* v. *Chambers*, 36 Minn.; *Powell* v. *Commonwealth*, 114 Pa. St. 265; *Powell* v. *Penn*, 127 U. S. 678.)

VII. Much stress is laid by counsel on the fact that the eight-hour provision restrains the freedom of contract, and therefore is obnoxious to the declaration of rights found in the constitution of Nevada.

Counsel's interpretation of the act is certainly not a fair or proper one, because the most that can be said is, that it merely limits the contract of the operator of a mine, smelter, or ore reduction works, with his employee to work in any of such places more than eight hours during any twenty-four hours. It leaves him free to hire as many men as he pleases to continue his industry, both day and night, every day in the week, month and year, and it in no way attempts to interfere with the rate of compensation. (*People* v. *Lochner*, 76 N. Y. Supp. 401; *Esser* v. *Spaulding*, 17 Nev. 289; *Holden* v. *Hardy*, 169 U. S. 366.)

*Statutes Relating to Hours of Labor*: Indiana has an eight-hour statute which pertains to all persons except those engaged in agricultural or domestic labor. (See Rev. Stats. 1894, p. 381.)

Michigan has a statute making ten hours a legal day's work. (See Howell's Annotated Stats. 1883.)

VIII. Georgia has a stringent law providing for the hours of labor in cotton mills. The provisions of this act extend only to certain classes of employees. (See Acts of 1889, p. 163.)

Louisiana has a statute making the employment of street car conductors or drivers for more than twelve hours unlawful. The law is very stringent. (See Act No. 95, 1886.)

Maryland has a statute regulating the hours of labor on street railways to twelve hours per day. The law is severe

in its penalty for any violation thereof. (See Article XXVII, Public General Laws.)

Arizona has an eight-hour law extending to those employed in underground mines and ore reduction works. Likewise Montana has a similar law. Also a large number of other states have statutes regulating the hours of labor between the employer and employee.

Apparently no litigation has ever arisen under the laws to which reference has just been made. It appears that they have been accepted and acquiesced in by all of those whom they affected.

IX. *Eight-Hour Decisions:* The following is a list of cases in which will be found carefully considered and elaborate opinions by our courts in the various states: *Commonwealth* v. *Hamilton Mfg. Co.*, 120 Mass. 383; *Holden* v. *Hardy* (mining case)', 14 Utah, 71, 46 Pac. 756; *State* v. *Hardy*, (milling case), 14 Utah, 96, 46 Pac. 1107; *Holden* v. *Hardy*, 169 U. S. 366; *Wenham* v. *State*, 91 N. W. 421; *State* v. *Buchanan*, 70 Pac. 52; *Commonwealth* v. *Beatty*, 15 Pa. Sup. Ct. 5, opinion beginning on p. 12; *People* v. *Lochner*, 76 N. Y. Supp. 396; *Short* v. *Bullion-Beck & Champion M. Co.*, 20 Utah, 20.

While the foregoing extracts indicate the line of reasoning found in the eight-hour decisions, yet we earnestly request the court to read each of the decisions, for the reason that all of the objections which have been raised against the validity of the act in question have been fully discussed by the courts rendering the opinions, and the contention made by the state in the case at bar absolutely upheld and sustained.

X. Counsel contends that employment in underground work and employment in aboveground work is treating of two subjects. He evidently mistakes the object to be accomplished by the law in question. This question has been fully discussed, and the objection of counsel is fully answered in the case of *Ex Parte Livingston*, 20 Nev. 282. The court said: "An act fixing the time for the opening and closing of saloons and gaming houses (Stat. 1889, 71), is not repugnant to the constitutional provision that each act shall embrace but one subject, and matter properly connected

therewith, which subject shall be briefly expressed in the title."

The title of the act in question might be changed so as to fit the act under consideration very easily. The object to be attained by the law under consideration in *Ex Parte Livingston*, was to promote the public morals, and therefore, in the judgment of the legislature, it was necessary to legislate upon those things which tended to prevent the existence of good morals in the community. The legislature judged that the closing of saloons and the closing of gambling houses during certain hours would promote this end. Of course, a saloon might be run and managed by one individual, and he might not have anything to do with a gambling house; likewise the man running a gambling house might not have any saloon in connection therewith, and the business might be absolutely separate, but, as the end to be accomplished was for the purpose of promoting public morals, the legislature embraced those subjects in the act that would bring about the end sought.

XI. The object of the law under consideration is to protect the health and safety of the workman, and the legislature has judged that his work, prolonged beyond certain hours in the industries mentioned in the act, is detrimental to his health, and by curtailing it to eight hours per day the general health and safety would be promoted, so that it is absolutely clear that but one subject is legislated upon in the act.

In the case of *Wenham* v. *State*, 91 N. W. 420, the court held that: "The act of the legislature, approved March 3, 1899, to regulate and limit the hours of employment of females in manufacturing, mechanical and mercantile establishments, hospitals and restaurants, to provide for its enforcement and a penalty for its violation, contains but one subject, and its terms are no broader than the title in which its subject is clearly expressed."

To the same effect see *Ahell* v. *Clarke*, 64 Cal. 226.

Counsel in his argument stated that there was nothing in the act which shows that it is a health regulation. This is not necessary, and, really, in none of the acts that have been held constitutional, was there any statement labeling it a health or safety provision. Long preambles which were

characteristic of legislative enactments in England, and for a while resorted to in the early history of the older states, have long ago been discontinued, and now really no legislature in the United States prefaces a bill, which it is about to enact into a law, by a preamble. It will suffice, however, to say, that in this state there is an act the title of which is "An act to provide for the taking care of the insane of the State of Nevada," and which was upheld as being constitutional by the court, and broad enough to allow the construction of an asylum, as well as proceedings by which the money for its cost should be obtained.

What were the objects of this act? They are necessarily expressed in the law, and a glance is sufficient to show that the object to be attained was first to provide for the physical wants of these helpless individuals, to prevent them from injuring themselves or their property, and also to prevent them from injuring others and their property. If counsel's objection would be well taken because these objects are not stated in some preamble, or in some other manner, then the law should be held invalid, but such an absurd contention, in the light of modern methods of legislation, comes too late to be given any attention. Courts, legislatures, and the public are presumed to have knowledge of the common affairs of life, and have arisen to such intelligence that preambles are no longer required or used.

XII. *Eminent Domain:* In this state the business of mining and reducing ores containing the precious metals has been declared for the "public use." On its behalf the right of "eminent domain" has been asserted. It would be strange, indeed, if the state could take private property from its rightful owners for the benefit of mining and milling, in utter disregard of that sacred right of personal contract of which we have heard so much in this case, and still be powerless to regulate the business in such manner as to protect the health and the lives of the workingmen employed. (Comp. Laws, sec. 283; *Dayton Mining Co.* v. *Seawell*, 11 Nev. 394; *Overman M. Co.* v. *Corcoran*, 15 Nev. 148; also separate opinions by Judges Bartlet and Miner in the case of *State* v. *Holden*, 14 Utah, 71–96, the opinion referred to appearing on the latter page.)

XIII. The authorities which counsel for petitioner has cited cannot be of any great weight in enlightening this court, inasmuch as the statute related to other matters, and had other objects to be attained than the preservation of the health and safety of workmen.

It has been said that the opinion of the court must always be read in connection with the facts upon which it was based. (*Doyle* v. *Ins. Co.*, 94 U. S. 538; *Ins. Co.* v. *Morse*, 20 Wall. 456.)

It has also been intimated by counsel that the state should show some affirmative provision in the constitution authorizing the act in question. This certainly is an exceedingly erroneous notion of our form of government. It has been said "an express enumeration of legislative powers is not an exclusion of others not named, unless accompanied by negative terms." (*Ex Parte McCarty*, 29 Cal. 396.)

Also, "Whatever is not expressly denied to the legislative power is possessed by it." (*Page* v. *Allen*, 15 Pa. St. 338.)

A close perusal of the principles of constitutional law will convince any student that this is the rule of law, namely, the legislature being invested with complete power for all purposes of civil government, and the state constitution being merely a limitation on that power, the court will look into it, not to see if the enactment in question is authorized, but only to see if it is prohibited. A search all through the constitution of Nevada will not disclose any inhibition to legislation of the kind under discussion, either in terms or by any reasonable inference.

This court has said: "The state legislature possesses legislative power unlimited except by the federal constitution and such restrictions as are expressly placed upon it by the state constitution; it is within the sphere of legislation the exponent of the popular will, endowed with all the power in this respect which the people themselves possessed at the time of the adoption of the constitution. The power to make the law must necessarily carry with it the right to judge of its expediency and justice." (*Gibson* v. *Mason*, 5 Nev. 284.)

*F. M. Huffaker*, for Petitioner, in reply:

I. Counsel neither in their oral arguments, nor in their

brief, seem to distinguish between police power, and the scope of the power. It has been said that "Police power, in its broadest acceptation, means the general power of a government to preserve and promote the public welfare even at the expense of private right." This is not a definition of the power, but a statement of its scope. It seems clear that the statute at bar does not come within this scope, for it does not in any sense "preserve or promote the public welfare."

Again, in *State* v. *Mississippi*, 101 U. S. 814, the court said: "Many attempts have been made by this court and elsewhere to define the police power, but never with entire success. It is always easier to determine whether a particular case comes within the general scope of the power, than to give an abstract definition of the power itself." And Shaw, C. J., in *Com.* v. *Alger*, 7 Cush. (Mass.) 85, speaking of the scope of the police power, illustrates by saying: "Such are the laws to prohibit warehouses from being used for the storage of gunpowder near habitations and highways; to restrain the height to which wooden buildings may be erected in populous neighborhoods, and require them to be covered with slate or other incombustible material; to prohibit buildings from being used as hospitals for contagious diseases or for carrying on noxious or offensive trades; to prohibit the raising of a dam and causing stagnant water to spread over meadows near inhabited villages, thereby causing noxious exhalations injurious to health and dangerous to life."

II. If the subject of the act of February 23, 1903, were within the police power of the state, under our present constitution it could not be sustained, being special legislation, contrary to section 20 of article IV. The subject of this act is the hours that shall constitute a day's work, when the legislature could have simply said, eight hours shall constitute a day for employees. Then the question would occur, would not the legislature have to follow the same course it does in fixing the rate of interest, when it says when there is no express contract fixing a different rate, the rate shall be seven per cent (Stats. 1887, 82), and say: Eight hours shall constitute a day for employees in the absence of any contract to the contrary? The very language of the interest statute, which is admittedly within the police power, indi-

cates that in 1887 the people, by their legislature, recognized the limitations of the constitution upon their power to interfere with the right of private contract.

If hours, to constitute a day's work, is a subject within the police power of the state, for any purpose, then it must be for all purposes, and under section 20 of article IV must be regulated by a general law. Counsel argue that section 20 does not apply to the police power of the state, because, as I understand them, police legislation must necessarily be special. I differ from them in toto on this proposition, for it is contrary to the reading of our constitution. Counsel make no distinction in analyzing this statute, but treat it as a whole, when it is evident it does not only say eight hours shall constitute a day's work, but steps to another subject and says that contracts for more hours shall not be made, and when it comes to the crime of the matter, says it shall be a misdemeanor to contract for more hours of work, whether any work should be done under the contract or not, and a misdemeanor for working under the contract. Has the legislature power to legislate thus? If not, the statute cannot stand, under section 17 of article IV.

Every objection, therefore, to this act made by petitioner, is well taken.

III. For the purpose of ascertaining whether the act at bar is within or without the limitations of the constitution, this court has well said *In re Wallace* v. *The Mayor and City Council of the City of Reno:* "Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizen, and to the preservation of good order and the public morals." This was said in a liquor license case, but, as a general proposition, the principle announced is correct. But it is clear that the act involved is not of this class. Counsel in their brief mainly discuss everything under what is admittedly within the police power of a state—subjects relating to general regulations of pernicious trades, unwholesome manufacture of food and drink, insane and other persons under legal disability, and then say making eight hours

a day's work is of the same class as requiring mine owners to provide safety cages for their employees, to prove which they cite *Esser* v. *Spaulding*, 17 Nev. 289. The remainder of their citations are about as applicable.

*Alfred Chartz, amicus curiæ:*

I.  The state's brief contends that a statute can only be declared unconstitutional where specific restrictions upon the power of the legislature can be pointed out.

The declaration of rights in the constitution of the State of Nevada, and the fourteenth amendment to the constitution of the United States are hereby pointed out as specific restrictions upon the power of the legislature to pass the law in question.

At page 17 of the state's brief, the reasoning therein with reference to *Low* v. *Printing Co.* is peculiarly applicable to this case. The Nebraska case is admitted to be unconstitutional, because it excepted those engaged in farming and domestic labor, and the brief emphasizes the fact by underscoring the words. Farming and domestic labor are believed to be healthy occupations, and might well be excluded as not coming under the police power. Then the brief argues that it was wrong to exclude farm laborers and domestic labor from the operation of the act and not exclude landscape gardeners. In Boston they call farmers landscape gardeners, and in Nevada we call them all ranchers. However, the gist of the argument is that the Nebraska act was unconstitutional because included within the provisions of the act were employments which were healthy according to common knowledge. *In para materia*, it is here submitted that if the act in question includes employments that are of common knowledge healthy and safe—as employment goes generally— it is also unconstitutional. It is further submitted that plowing, shoveling and scraping tailings into tanks containing cyanide solutions is just as healthy an employment as digging ditches through swamps on a ranch, or running threshing machines, or breaking colts, or driving young mules, or any other kind of farm labor.

The act is unconstitutional because it is in contravention of article IV, section 21, of the constitution of the State of

Nevada, in that it is not uniform and general in its application.

"It is not competent to single out certain industries and impose upon them certain restrictions with reference to the hours of labor of their employees, from which other employers of labor are exempt." (*In re Eight-Hour Law*, 21 Colo. 29; *In re Morgan*, 58 Pac. 1071, cited in state's brief; Am. Digest, Century ed. vol. X, p. 2079, sec. 656.)

The act is unconstitutional because it is in contravention of the fourteenth amendment of the constitution of the United States, section 1, and also the fifth amendment. (Am. & Eng. Ency. of Law, 2d ed. vol. X, p. 298, subd. 3; *In the Matter of Jacobs*, 98 N. Y. 98; 33 Hun, N. Y. 374; *Ritchie* v. *People*, 155 Ill. 98.)

The act is unconstitutional as being in contravention of article I, section 1, of the constitution of the State of Nevada, and of the fifth and fourteenth amendments to the constitution of the United States. "The privileges and immunities referred to in the fourteenth amendment are all those rights which are fundamental and belong to all citizens of free governments." (*Slaughter-House Case*, 16 Wall. (U. S.) 36; *In re Tiburcio Parrott*, 6 Sawy. (U. S.) 349.)

It includes the right to labor and to pursue any lawful employment in any manner, and to make lawful contracts. (Ency. of Law, vol. VI, p. 966, note 6; *The Stockton Laundry Cases*, 26 Fed. Rep. 611; *In re Tiburcio Parrott*, 6 Sawy. 349; *In re Grice*, 79 Fed. 627; *Matter of Jacobs*, 98 N. Y. 98; *State* v. *Fire Creek Coal Co.*, 33 W. Va. 188, and *State* v. *Goodwill*, 33 W. Va. 179, in which the court says: "A person living under the protection of this government has the right to adopt and follow any lawful industrial pursuit not injurious to the community, which he may see fit. And, as incident to this, is the right to labor and employ labor, make contracts in respect thereto, upon such terms as may be agreed upon by the parties." (*In re Eight-Hour Law*, 21 Col. 29; *Low* v. *Rees Printing Co.*, 41 Neb. 127; *Ex Parte Kubach*, 85 Cal. 274; *People* v. *Warren*, 77 Hun, (N. Y.) 120; *Wheeling Bridge and Terminal Co.* v. *Gilmore*, 8 Ohio Cir. Ct. 658; Am. Dig. Century ed. p. 2247, where many authorities on the several questions are collated; *People* v. *Orange County Road Construction Co.*, N. E. 129; *Cleveland* v. *Clements Bros. Co.*

(Ohio) 59 L. R. A. 775; Cooley on Constitutional Limitations, quoted in *Ex Parte Kubach*; 85 Cal. 276; Magna Charta, c. 28.)

One of counsel for the state, in his oral argument, attempted to apologize for the decision in the Morgan case (58 Pac. 1071), by claiming that the decision was born of pique. Just think of the Supreme Court of Colorado being influenced by feeling against an attorney in deciding a case involving the rights of all employers and employees in the state. The explanation is unique.

II. Counsel in their brief say that long preambles to the introduction of an act have gone into disuse. They have not gone into disuse where they are yet necessary. Look at the little preamble in the water law of 1903. In the act in question, I claim that a preamble would not only have been eminently proper, but necessary. The question of whether employment in mines and reduction works in Nevada is unhealthy and dangerous is left entirely to counsel for argument.

Arizona and Montana have eight-hour laws, as counsel states, but he does not set them side by side, with Utah and Nevada, and he leaves out Colorado's eight-hour law. I don't blame him. Counsel also fail to tell the court that Pennsylvania has a constitutional provision covering the point authorizing the legislature to pass such a law as it passed.

However, eliminating all acts which are not exactly like the act in question, and eliminating all authority not based upon such acts as the act in question, we find that there are but three alike in every substantial particular, and those are Utah, Nevada and Colorado. The people of Utah solemnly granted to the legislature the power to regulate the hours of labor. It was held in Utah that, the people having granted the legislature that right, the legislature had the right to exercise it. Worse than that, the people said the legislature shall pass such law. In Colorado no such grant of civil right was ever made, and no such grant was ever made in Nevada. Colorado and Nevada, therefore, stand on exactly the same plane of right, and therefore the decision of the Supreme Court of Colorado is the only authority cited applicable to

the case from all its viewpoints.    By this I do not mean that
the decisions cited for petitioner are not applicable *in para
materia*, and as authorities, but I mean from every point of
view the Colorado decisions fit, dead pat.    Not only that,
but one in a "Battleborn State" and the other a "Centennial
State," enjoying practically the same climate, with the same
kind of mining work as their paramount industry, and using
the same kind of machinery, requiring the same amount of
water for irrigation, and adopting similar laws, and settled
about the same time, and both sending the greatest champions
of the silver cause to Congress, as the attorney-general says,
"like two peas in a pod."  Utah enjoys a similar climate and
conditions, but is working under a different constitution.

It may be argued that the people at the last election
indirectly voted for the passage of an eight-hour law.    This
reminds me:    In Austin, in 1863, a waiter asked a customer
if he would have tea or coffee, and the customer asked for
coffee.  "You'll take tea; there is no coffee."  So it was
with our last election—the people had to take tea.

III.    The cases of *Commonwealth* v. *Hamilton Mfg. Co.*,
120  Mass. 363; *Wenham* v. *State*, 91  N. W. 421; *State* v.
*Buchanan*, 70 Pac. 52; *Commonwealth* v. *Beatty*, 15 Pa. Sup.
Ct. 5, and *People* v. *Lochner*, 76 N. Y. Supp. 396 (all others
being Utah cases), cited by counsel as being eight-hour law
decisions, are cases based upon entirely different conditions
as to employment, climate and sex, and do not apply.    It is
notorious that in the east women and children have worked
up to human endurance, and in the west it is notorious that
men have enjoyed pretty much their own way, and that
right now they are seeking and begging employment, and
enjoy too much time on the surface within which to recuper-
ate their bodies and expand their lungs.    We are thus
invariably driven back to the question of fact, as to this all-
important question in Nevada, and no facts are before the
court to assist it in its judgment, as to whether the law can
be reasonably upheld as a police regulation, lying dormant
within the police power of the state.

By the Court, TALBOT, J.:

Petitioner was arrested, convicted, and sentenced for work-

ing in an underground mine more than eight hours in one day, contrary to the provisions of an act passed by our last legislature which provides:

"Section 1. The period of employment of working men in all underground mines or workings shall be eight hours per day, except in cases of emergency where life or property is in imminent danger.

"Sec. 2. The period of employment of working men in smelters and in all institutions for the reduction or refining of ores or metals shall be eight hours per day, except in cases of emergency where life or property is in imminent danger.

"Sec. 3. Any person who violates either of the preceding sections of this act, or any person, corporation, employer or his or its agent, who hires, contracts with, or causes any person to work in an underground mine or other underground workings, or any smelter or any other institution or place for the reduction or refining of ores or metals for a period of time longer than eight hours during one day unless life or property shall be in imminent danger shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than one hundred dollars, nor more than five hundred dollars, or imprisonment in the county jail not more than six months, or by both such fine and imprisonment.

"Sec. 4. This act shall take effect sixty days from and after its passage." (Stats. Nev. 1903, p. 33, c. 10.)

Upon his failure to pay the fine of $100 imposed, he was committed to the custody of the sheriff. He applies to this court for his liberty, and on his behalf it is urged that his conviction is void because the statute conflicts with section 1 of article I of our state constitution, which declares that "all men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness," and that the act is inimical to the fourteenth amendment to the federal constitution, which declares that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;

nor shall any state deprive any person of life, liberty or prop-
erty without due process of law; nor deny to any person
within its jurisdiction, the equal protection of its laws."

Although the constitutionality of this eight-hour law is
now challenged before us for the first time, and questions of
much interest and great import are involved, the fundamental
principles which govern the determination of its validity have
heretofore been recognized and enunciated by this court and
by the Supreme Court of the United States, the earthly tri-
bunals having final jurisdiction in this commonwealth; and
the purpose, force, and validity of similar statutes have been
carefully considered by that court and others in several
states.    It will be seen that the act does not attempt in any
way to regulate the amount of wages which an employer
shall pay, or an employee receive, for services by the day or
otherwise performed.   The language forbids any person from
working in underground mines, smelters, or mills for the
reduction of ores more than eight hours per day, and the
penalty is imposed alike on the man who labors in those
places longer than the time prescribed, and on the owner who
hires, and thereby encourages an infraction of the statute by
others in his service.    If he worked more than eight hours
in his own mine, he would be subject to the same punish-
ment as the man who labors for others, and the effect of the
statute is to prevent all persons from working in the places
named more than the designated number of hours.    The
employer is not required to pay any more per hour for the
labor or value he receives than he paid previous to the passage
of the act.    He may hire as many men as he may choose, and
he and the employee are as free to fix the compensation for
services performed on the basis of their actual value as before.
Both are prohibited from having the latter work more than
eight hours per day in the employments affected, but if loss,
temporary or otherwise, be occasioned by this curtailment of
labor, it is apparent that the statute does not require it to be
borne by the employer.

Labor properly directed creates wealth, and all honest toil
is noble and commendable.    The right to acquire and hold
property guarantied by our constitution is one of the most
essential for the existence and happiness of man, and for our

purposes here we may consider it to be the cornerstone in the temple of our liberties, and that it implies and includes the right to labor. It may also be granted that labor, the poor man's patrimony, the creator of wealth, and upon which all must depend for sustenance, is the highest species of property, and the right to toil is as sacred and secure as the millions of the wealthy; but individual rights, however great, are subject to certain limitations necessary for the good of others and the community, and inherent in every well-regulated government. While we are not forgetful of the important rights and constitutional guaranties of the individual, they are, at the most, only branches of the common tree, while the welfare of the state, which includes the protection of the health and lives of the people in their various industrial pursuits, is the trunk, without which the tree could not stand or bear fruit. The public good and the health of a considerable portion of our population, when placed in the balance, must outweigh and turn the scale, regardless of slight inconveniences and reasonable restrictions which individuals may suffer. This principle is of greater importance to every one than his more direct personal rights, for, without the prevalence and enforcement of this doctrine, no government could sustain itself and extend protection to its citizens. Broadly speaking, the right to acquire and hold property, which presupposes the one to labor at all ordinary pursuits, is subordinate to this greater obligation not to injure others, individually or collectively, and to contribute and aid in the support of the government in all its legitimate objects, among which we may consider the protection of the health and lives of that large portion of the people in this state who delve in the earth in search of the precious metals that help enrich the commerce of the world, and who there and in the smelters and ore reduction works come in contact with poisonous minerals, and breath dust, foul air, and obnoxious fumes and gases. In this connection it should be remembered that the statute applies to underground mines, and not to placer claims, or to men working in the open above the surface. That a large proportion of our population are engaged in the pursuits in which the hours of labor are restricted is a matter of general

knowledge. The legislature in 1875 declared the mining,
milling, and smelting of ores to be for the public use, and,
when necessary for these purposes, authorized the taking of
private property by way of eminent domain. (Comp. Laws,
sec. 283.) And in 1887 they declared that mining was the
paramount interest of the state, and authorized condemna-
tion proceedings for its promotion in certain instances.
(Comp. Laws, sec. 281.)

We cannot close our eyes and deny that employment in
the places named in the statute is unhealthful, when it is so
commonly known that men contract rheumatism and miner's
consumption working underground in powder smoke, and
damp, bad air; that they become leaded from the fumes in
smelters; and that the most of those employed in one of the
largest quartz mills in the state during the past several years
became afflicted in from a few to several months with fine
particles of flinty dust, which, with the inflation and contrac-
tion in breathing, cut the lungs, and resulted in premature
and early death. We are not prepared to say that the mining,
milling, and smelting of ores are not vocations so unhealthy
and hazardous that they may not come under the protecting
arm of the legislature; but to recognize these conditions, and
pass measures for their amelioration, and which may protect
the health and prolong the lives of the men so employed, we
think, is within the legitimate powers of the lawmaking
branch of our government. As we will indicate later, the
Supreme Courts of Utah and the United States have held
these occupations to be unhealthful in that state, and there
is no apparent reason why they are not equally so here. If
these matters were uncertain when ther existence is necessary
to sustain the law, the doubt should be resolved in favor of
the statute, for, as held by this court in several decisions,
its validity will be presumed until it is clearly shown to
be unconstitutional. Justice Harlan, in delivering the
opinion of the Supreme Court of the United States a few
weeks since in the case involving the Kansas law making
eight hours a day for all engaged on public work, state, city,
or county—a different question than that involved here—
made these pertinent statements: "So, also, if it be said
that a statute like the one before us is mischievous in its

tendencies, the answer is that the responsibility therefor rests upon the legislators, not upon the courts. No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and, upon grounds merely of justice or reason and wisdom, annul statutes that had received the sanction of the people's representatives. We are reminded by counsel that it is the solemn duty of the courts, in cases before them, to regard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true, indeed, the public interests imperatively demand—that legislative enactments be recognized and enforced by the courts, as embodying the will of the people, unless they are plainly and palpably, and beyond all question, in violation of the fundamental law of the constitution."

In *Wallace* v. *Mayor and City of Reno*, 73 Pac. 531, 27 Nev. 71, we held that the people, and through them the legislature, had supreme power in all matters of government, where not restricted by constitutional limitations; and, adopting the language of the Supreme Court of the United States, we said: "Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, '*Salus populi suprema est lex*,' and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. All rights are held subject to the police power of the state."

The cases holding that the legislature may pass measures for the protection of the health, safety, and lives of the citizens are too numerous to require citation. These have been enacted and upheld in a variety of forms which limit in a greater or less degree the control and acquisition of property.

Quarantine regulations, state and national, for the protection
of the many and in restraint of the individual, and affecting
people and various animals, prevail generally.   The use of
safety devices has been enforced in mining, mills, and fac-
tories, and on railroads.  By ordinance, vestibules are required
on street cars to protect motormen from the inclemency of
the weather.   Various trades are prohibited or regulated, so
as not to injure the health of those employed or others.   A
proportion of private property is exacted by way of taxation
for the support of schools, asylums, hospitals, and for other
public and beneficial purposes, present and future.   More
directly, laws have been sustained shortening the hours of
labor in bakeries, barber shops, and laundries—places less
unhealthy and affecting a smaller class than mines and
smelters—and for women in manufacturing establishments.
Considerations peculiar to sex have been advanced in some
instances in support of the latter, but to have strong, healthy
men, instead of sickly and disabled ones, without earning and
self-supporting capacity, and resultant widows and orphans
dependent upon private and public charity, is quite as impor-
tant to the state in time of peace or war; and the health and
lives of all the people, wherever endangered, should receive
care and protection.

Of the statute we have under consideration, sections 1 and
2 are copied literally, and section 3 substantially, from an act
found in the Session Laws of Utah for 1896, at page 219,
c. 72, which was sustained as being not unconstitutional by
the Supreme Court of that state and of the United States.
(*State* v. *Holden*, 14 Utah, 71, 46 Pac. 756, 37 L. R. A. 103;
Id., 14 Utah, 96, 46 Pac. 1105, 37 L. R. A. 108; *Holden* v.
*Hardy*, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780; *Short* v.
*Mining Co.*, 20 Utah, 20, 57 Pac. 720, 45 L. R. A. 603.)

The Utah Bill of Rights, in slightly varying language, con-
tains the same guaranty as ours for acquiring and holding
property, but section 6 of article XVI in the constitution of
that state directs that "the legislature shall pass laws to pro-
vide for the health and safety of employees in factories,
smelters and mines."   This must be regarded as a command
to the legislature there on a subject in regard to which our
constitution is silent, but the validity of the statute under

challenge depends upon power which may exist without the command. This direction to the legislature would imply and supply power if it did not otherwise exist, but, as we have already seen, the authority to provide for the health, safety, and welfare of the citizen is inherent in the police power of the legislature, without any express provision. Our constitution being silent in that regard, our legislature could exercise the power at their discretion, while there the command made action obligatory. Here the legislature is the uninstructed general agent of the people, free to exercise its own judgment in matters coming within the police powers of the state; and the power necessary to sustain the validity of the statute exists here as well as there, and would exist there regardless of the command. It should be remembered that the Utah constitution does not direct the legislature to regulate the hours of labor in mines and smelters, but only to provide for the health and safety of employees therein, and that this law in that state can be sustained only as a health regulation, such as are within the general police powers, regardless of the constitutional command, for otherwise it is not authorized any more there than here. The extent of the command is for the legislature to provide for the health of these employees. Every legislature is authorized to provide for the health of the people, where endangered, and for their welfare in other ways. The power is as inherent here as it is complete there, and, if the curtailment to eight of the hours of labor in the mines and smelters in Utah promotes the health of the employees, ergo it does the same here. Since the constitution of Utah confers no power that is not possessed by our legislature, and the conditions in mines and smelters may not be considered materially different there from what they are here, it is presumed that when our legislature adopted this statute it adopted the construction which had been placed upon it at the time of its adoption by the Supreme Court of that state and the United States. It was said in *State* v. *Robey*, 8 Nev. 320, that "it is well settled that when a statute has received a judicial construction, and is afterwards adopted by another state, the construction as well as the terms of the statute will be deemed adopted." To the same effect are *Williams* v. *Glasgow*, 1 Nev. 533, and *McLane*

v. *Abrams*, 2 Nev. 190; and in *Gould* v. *Wise*, 18 Nev. 254, 3 Pac. 30, it was held that the reënactment of the statute after an authoritative construction by the courts, and in that case by the United States District Court, was a legislative adoption of the court's construction.

The questions involved have been carefully considered and ably discussed in a number of decisions, from which we quote (*State* v. *Holden, supra*) :

"If the power to pass the law is conceded, the court cannot set it aside because it may deem its enactment unnecessary or injudicious, or because the court may think that experience has proven it so, or because the court may think itself more sagacious than the legislature, and can therefore see more clearly that the law will retard, rather than promote, progress and prosperity, and will be a detriment to the common good when actually applied to human affairs amid the conditions of the future.

"This brings us to the question, Is the first section of the statute, limiting the period of employment of laboring men in underground mines to eight hours per day, except in cases of emergency, where life or property is in imminent danger, calculated to protect the health of such laboring men? The effort necessary to successful mining, if performed upon the surface of the earth, in pure air and in the sunlight, prolonged beyond eight hours, might not be injurious, nor affect the health of ablebodied men. When so extended beneath the surface, in atmosphere laden with gas, and sometimes with smoke, away from the sunlight, it might injuriously affect the health of such persons. It is necessary to use artificial means to supply pure air to men laboring any considerable distance from the surface. That being so, it is reasonable to assume that the air introduced, when mixed with the impure air beneath the surface, is not as healthful as the free air upon the surface. The fact must be conceded that the breathing of pure air is wholesome, and that the breathing of impure air is unwholesome. We cannot say that this law, limiting the period of labor in underground mines to eight hours each day, is not calculated to promote health; that it is not adapted to the protection of the health of the class of men who work in

underground mines. While the provision of the constitution under consideration makes it the duty of the legislature to enact laws to protect the health and to secure the safety of men working in underground mines, and in factories and smelters, it does not prohibit the legislature from enacting other laws protecting such classes, to promote the general welfare. The authority of the general government is ascertained from the powers delegated, while those of the state government are ascertained from those not prohibited. This leaves the state legislature in the possession of all the law-making power not prohibited to it by the constitution of the United States, or the laws made in pursuance of it, or by the state constitution. The enactment of some laws is made mandatory. The enactment of others is left to the discretion of the legislature as the public welfare may demand.

"The fourteenth amendment of the federal constitution forbids the denial to any class of persons of the equal protection of the laws by any state, and we have no doubt that class legislation is forbidden. But some pursuits are attended with peculiar hazard and perils, the injurious consequences from which may be largely prevented by precautionary means, and laws may be passed calculated to protect the classes of people engaged in such pursuits. It is not necessary to extend the protection to persons engaged in other pursuits not attended with similar dangers. To them the law would be inappropriate and idle. So, if underground mining is attended with dangers peculiar to it, laws adapted to the protection of such miners from such danger should be confined to that class of mining, and should not include other employments not subject to them. And if men engaged in underground mining are liable to be injured in their health or otherwise by too many hours' labor each day, a law to protect them should be aimed at that peculiar wrong. In this way laws are enacted to protect people from perils from the operation of railroads, by requiring bells to be rung and whistles sounded at road crossings, and the slacking of the speed of trains in cities. So the sale of liquors is regulated to lessen the evils of the liquor traffic, and other classes of business are regulated by appropriate laws. In this way laws are designed and adapted to the peculiarities

attending each class of business. By such laws different classes of people are protected by various acts and provisions. In this way various classes of business are regulated, and the people protected by appropriate laws from dangers and evils that beset them, safety is secured, health preserved, and the happiness and welfare of humanity promoted. All persons engaged in business that may be attended by peculiar injury to health or otherwise if not regulated or controlled should be subject to the same law; otherwise the law should be adapted to the special circumstances.

"An ordinance of the city and county of San Francisco prohibited the washing and ironing of clothes in public laundries and washhouses within certain prescribed limits of the city and county from ten o'clock at night until six o'clock on the morning of the following day; and one Soon Hing was fined and imprisoned for a violation of it, and he petitioned for a writ of *habeas corpus*, on the ground that the ordinance was void, because it discriminated between the classes of laborers engaged in the laundry business and those engaged in other kinds of business, and it discriminated between laborers beyond the designated limits and those within them; that it deprived the petitioner of the right to labor, and, as a necessary consequence, of the right to acquire property; and that the board had no power to pass it. The writ was denied by the lower court, and the judgment was brought before the Supreme Court of the United States, and affirmed by that court. Among other things, that court said in its opinion: 'The specific regulations for one kind of business which may be necessary for the protection of the public can never be the just ground of complaint because like restrictions are not imposed upon other business of a different kind. The discriminations which are open to objection are those where persons engaged in the same business are subject to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discriminations can be said to impair that equal right which all can claim in the enforcement of the laws.' (*Soon Hing* v. *Crowley*, 113 U. S. 703 [5 Sup. Ct. 730, 28 L. Ed. 1145]; *Barbier* v. *Connolly*, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923).

"Judge Cooley says: 'Whether a statute is constitutional or not is always a question of power; that is, a question whether the legislature, in the particular case, in respect to the subject-matter of the act, the matter in which its object is to be accomplished, and the mode of enacting it, has kept within the constitutional limits, and observed the constitutional limits. In any case in which this question is answered in the affirmative, the courts are not at liberty to inquire into the proper exercise of the power. We must assume that the legislative discretion has been properly exercised.' (Cooley, Const. Lim. 6th ed. p. 220.)

"The Supreme Court of Massachusetts, in the case of *Com.* v. *Hamilton Mfg. Co.*, 120 Mass. 383, held that a law declaring that a woman should not be employed at labor by any person, firm, or corporation in any manufacturing establishment more than ten hours in any one day, except in certain cases, and in no case more than sixty hours a week, was constitutional and valid. The court said: 'It does not forbid any person, firm, or corporation from employing as many persons or as much labor as such person, firm, or corporation may desire; nor does it forbid any person to work as many hours a day or a week as he chooses. It merely provides that, in an employment which the legislature has evidently deemed dangerous to some extent to health, no woman shall be engaged in labor more than ten hours a day or sixty hours a week. There can be no doubt that such legislation can be maintained, either as a health or police regulation, if it were necessary to resort to either of these sources for power. This principle has been so frequently recognized in this commonwealth that reference to the decisions is unnecessary.'

"The section of the statute of which the constitutionality is involved in this case includes all employees and employers engaged in working underground mines. None are omitted who may be subject to the peculiar conditions that attend such mining. And we are not authorized to hold that the law in question is not calculated and adapted in any degree to promote the health and safety of persons working in mines and smelters. Were we to do so, and declare it void, we would usurp the powers intrusted by the constitution to the lawmaking power."

In affirming the decision of the Supreme Court of Utah, the Supreme Court of the United States, in *Holden* v. *Hardy*, made a clear and elaborate statement, which is peculiarly applicable here, and of which we reproduce a part of the most direct paragraphs:

"This right of contract, however, is itself subject to certain limitations which the state may lawfully impose in the exercise of its police powers.    While this power is inherent in all governments, it has doubtless been greatly expanded in its application during the past century, owing to an enormous increase in the number of occupations which are dangerous, or so far detrimental 'to the health of employees as to demand special precautions for their well-being and protection, or the safety of adjacent property.    While this court has held, notably in the cases *Davidson* v. *New Orleans*, 96 U. S. 97 [24 L. Ed. 616], and *Yick Wo* v. *Hopkins*, 118 U. S. 356 [6 Sup. Ct. 1064, 30 L. Ed. 220], that the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety, or morals, or the abatement of public nuisances, and a large discretion 'is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests.' (*Lawton* v. *Steele*, 152 U. S. 136, 14 Sup. Ct. 501, 38 L. Ed. 385.)

"The extent and limitations upon this power are admirably stated by Chief Justice Shaw in the following extract from his opinion in *Commonwealth* v. *Alger*, 7 Cush. 53, 84:

"'We think it is a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that its use may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling

power vested in them by the constitution, may think necessary and expedient.'

"This power, legitimately exercised, can neither be limited by contract, nor bartered away by legislation.

"While this power is necessarily inherent in every form of government, it was, prior to the adoption of the constitution, but sparingly used in this country.  As we were then almost purely an agricultural people, the occasion for any special protection of a particular class did not exist.  Certain profitable employments, such as lotteries and the sale of intoxicating liquors, which were then considered to be legitimate, have since fallen under the ban of public opinion, and are now either altogether prohibited, or made subject to stringent police regulations.  The power to do this has been repeatedly affirmed by this court.  (*Stone* v. *Mississippi*, 101 U. S. 814 [25 L. Ed. 1079]; *Douglas* v. *Kentucky*, 168 U. S. 488 [18 Sup. Ct. 199, 42 L. Ed. 553]; *Giozza* v. *Tiernan*, 148 U. S. 657 [13 Sup. Ct. 721, 37 L. Ed. 599]; *Kidd* v. *Pearson*, 128 U. S. 1 [9 Sup. Ct. 6, 32 L. Ed. 346]; *Crowley* v. *Christensen*, 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620.)

"While the business of mining coal and manufacturing iron began in Pennsylvania as early as 1716, and in Virginia, North Carolina, and Massachusetts even earlier than this, both mining and manufacturing were carried on in such a limited way, and by such primitive methods that no special laws were considered necessary, prior to the adoption of the constitution, for the protection of the operatives; but, in the vast proportions which these industries have since assumed, it has been found that they can no longer be carried on with due regard to the safety and health of those engaged in them without special protection against the dangers necessarily incident to these employments.  In consequence of this, laws have been enacted in most of the states designed to meet these exigencies, and to secure the safety of persons peculiarly exposed to the dangers.  Within this general category are ordinances providing for fire escapes from hotels, theaters, factories, and other large buildings, a municipal inspection of boilers, and appliances designed to secure passengers upon railways and steamboats against the dangers necessarily incident to these methods of transportation.  In

states where manufacturing is carried on to a large extent, provision is made for the protection of dangerous machinery against accidental contact, for the cleanliness and ventilation of working rooms, for the guarding of well holes, stairways, elevator shafts, and for the employment of sanitary appliances. In others, where mining is the principal industry, special provision is made for the shoring up of dangerous walls, for ventitation shafts, bore holes, escapement shafts, means of signaling the surface, for the supply of fresh air, and the elimination, as far as possible, of dangerous gases, for safe means of hoisting and lowering cages, for a limitation upon the number of persons permitted to enter a cage, that cages shall be covered, and that there shall be fences and gates around the top of shafts, besides other similar precautions.

"These statutes have been repeatedly enforced by the courts of the several states, their validity assumed, and, so far as we are informed, they have been uniformly held to be constitutional.

"In *Daniels* v. *Hilgard*, 77 Ill. 640, it was held that the legislature had power, under the constitution, to establish police regulations for the operating of mines and collieries, and that an act providing for the health and safety of persons employed in coal mines, which required the owner or agent of every coal mine or colliery employing ten men or more to make or cause to be made an accurate map or plan of the workings of such coal mine or colliery, was not unconstitutional, and that the question whether certain requirements are a part of a system of police regulations adopted to aid in the protection of life and health was properly one of legislative determination, and that a court should not lightly interfere with such determination unless the legislature had manifestly transcended its province. See, also, *Litchfield Coal Co.* v. *Taylor*, 81 Ill. 590.

In *Commonwealth* v. *Bonnell et al.*, 8 Phila. 534, a law providing for the ventilation of coal mines, for speaking tubes, and the protection of cages, was held to be constitutional, and subject to strict enforcement. (*Commonwealth* v. *Conyngham*, 66 Pa. 99; *Durant* v. *Lexington Coal Min. Co.*, 97 Mo. 62.)

"But if it be within the power of the legislature to adopt such means for the protection of the lives of its citizens, it is difficult to see why precautions may not also be adopted for the protection of their health and morals. It is as much for the interest of the state that the public health should be preserved as that life should be made secure.

"Upon the principles above stated, we think the act in question may be sustained as a valid exercise of the police power of the state. The enactment does not profess to limit the hours of all workmen, but merely those who are employed in underground mines, or in the smelting, reduction, or refining of ores or metals. These employments, when too long pursued, the legislature has judged to be detrimental to the health of the employees; and, so long as there are reasonable grounds for believing that this is so, its decisions upon this subject cannot be reviewed by the courts.

"While the general experience of mankind may justify us in believing that men may engage in ordinary employments more than eight hours per day without injury to their health, it does not follow that labor for the same length of time is innocuous when carried on beneath the surface of the earth, where the operative is deprived of fresh air and sunlight, and is frequently subjected to foul atmosphere and a very high temperature, or to the influence of noxious gases generated by the processes of refining or smelting."

Continuing, the United States Supreme Court said:

"We concur in the following observations of the Supreme Court of Utah in this connection in its opinion in No. 2:

"'The conditions with respect to health of laborers in underground mines doubtless differs from those in which they labor in smelters and other reduction works on the surface. Unquestionably the atmosphere and other conditions in mines and reduction works differ. Poisonous gases, dust, and impalpable substances arise and float in the air in stamp-mills, smelters, and other works in which ores containing metals, combined with arsenic or other poisonous elements or agencies, are treated, reduced, and refined; and there can be no doubt that prolonged effort day after day, subject to such conditions and agencies, will produce morbid, noxious, and often deadly effects in the human system. Some organ-

isms and systems will resist and endure such conditions and effects longer than others.   It may be said that labor in such conditions must be performed.   Granting that, the period of labor each day should be of a reasonable length.   Twelve hours per day would be less injurious than fourteen, ten than twelve, and eight than ten.   The legislature has named eight.   Such a period was deemed reasonable.   The law in question is confined to the protection of that class of people engaged in labor in underground mines, and in smelters and other works wherein ores are reduced and refined.   This law applies only to the classes subjected by their employment to the peculiar conditions and effects attending underground mining and work in smelters, and other works for the reduction and refining of ores. Therefore it is not necessary to discuss or decide whether the legislature can fix the hours of labor in other employments. Though reasonable doubts may exist as to the power of the legislature to pass a law, or as to whether the law is calculated or adapted to promote the health, safety, or comfort of the people, or to secure good order or promote the general welfare, we must resolve them in favor of the right of that department of government.   But the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself.'   The state still retains an interest in his welfare, however reckless he may be.   The whole is no greater than the sum of all the parts, and when the individual health, safety, and welfare are sacrificed or neglected, the state must suffer.

"We are of the opinion that the act in question was a valid exercise of the police power of the state, and the judgments of the Supreme Court of Utah are therefore affirmed."

In *People* v. *Lochner* (Sup.) 76 N. Y. Supp. 399, the Supreme Court of New York said:   "The police power of the state is the power which enables it to promote the health, comfort, safety, and welfare of society.   It is very broad and far-reaching, but it is not without its limitations.   The line between the valid exercise of the police power and the

invasion of the private rights is clearly drawn by Judge Earl
in his opinion in *Re Jacobs*, 98 N. Y. 110, 50 Am. Rep. 636.
He says: 'Generally it is for the legislature to determine
what laws and regulations are needed to protect the public
health and secure the public comfort and safety; and while
its measures are calculated, intended, convenient, and appro-
priate to accomplish those ends, the exercise of its discre-
tion is not subject to review by the courts. But they must
have some relation to these ends. If the act and the con-
stitution can be construed so as to enable both to stand, and
each can be given a proper and legitimate office to perform,
it is the duty of the court to adopt such legislation. The
legislature, under the police power, may certainly regulate
or even prohibit the carrying on of any business in such
manner and in such place as to become dangerous or detri-
mental to the health, morals, or good order of the com-
munity.' Judge Vann, in discussing the statute entitled
'An act to regulate barbering on Sunday,' in *People* v. *Hav-
nor*, 149 N. Y. 204, 43 N. E. 544, 31 L. R. A. 689, 52 Am.
St. Rep. 707, says: 'As barbers generally work more hours
each day than most men, the legislature may well have con-
cluded that legislation was necessary for the protection of
their health.' And at page 203, 149 N. Y., and page 544,
43 N. E., 31 L. R. A. 689, 52 Am. St. Rep. 707, he says: 'It
is to the interest of the state to have strong, robust, healthy
citizens, capable of self-support, of bearing arms, and of
adding to the resources of the country. Laws to effect this
purpose, by protecting the citizen from overwork, and requir-
ing a general day of rest to restore his strength and preserve
his health, have, an obvious connection with the public
welfare.'

"It was held in *People* v. *Warden of City Prison*, 144 N. Y.
536, 39 N. E. 688, 27 L. R. A. 718, that 'the restraint of per-
sonal action is justified when it manifestly tends to the pro-
tection of the health and comfort of the community, and no
constitutional guarantee is then violated.' In *Health Depart-
ment of City of New York* v. *Rector of Trinity Church*, 145
N. Y. 32, 39 N. E. 833, 45 Am. St. Rep. 579, the court laid
down the rule that the legislature, in the exercise of its power
to conserve the public health, safety, and welfare, may direct

that certain improvements or alterations shall be made in tenant houses at the owners' expense, and that suitable appliances be supplied to receive and distribute a supply of water for domestic use. Judge Peckham, in discussing the constitutionality of the act (page 43, 145 N. Y., and page 836, N. E., 45 Am. St. Rep. 579), says: 'Laws and regulations of a police nature, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner.' In Tied. Lim. Police Power, 181, the author states: 'If the law did not interfere, the feverish, intense desire to acquire wealth, inciting a relentless rivalry and competition, would ultimately prevent not only the wage earner, but likewise the capitalist and employers themselves, from yielding to the warnings of nature, and obeying the instinct of self-preservation by resting periodically from labor.' If the statute under consideration invades the right of property and the liberty of the individual, then many of the statutes of this state that have been held to be constitutional, and their enactment within the police power of the state, are subject to the same criticism. The statute in question does not restrict the right of the defendant to carry on his business, or to engage as many persons as he sees fit in such business, but it simply prohibits him from requiring or compelling his employees to work more than ten hours in any one day, or more than sixty hours in any one week. In other words, the statute does not prohibit any right, but regulates it; and there is a wide difference between regulation and prohibition —between prescribing the terms by which the right may be enjoyed, and the denial of that right altogether. The defendant is not deprived of any right or privilege which is not denied to others in a similar business. The provisions of the statute in question are directed to all persons engaged in the bakery business. It neither confers special privileges, nor makes unjust discrimination. All who are engaged in that business are entitled to its benefits and subjected to its restrictions."

The opinions in California and Ohio holding that statutes

limiting the hours of labor on public works were unconstitutional, although not in point, may no longer be considered of weight, in the face of the recent decision to the contrary by the Supreme Court of the United States in the Kansas case. The employment was not shown or claimed to endanger health or life, nor could this be said of all the various occupations covered by the Nebraska act. When such strong considerations of public policy demand, it is not difficult to distinguish in principle between the cases relating to vocations unhealthful and dangerous, and those which are not, and we are unaware that any court where the conditions are the same has rendered an opinion contrary to the views we hold and express, excepting in *Re Morgan*, 26 Colo. 415, 58 Pac. 1071, where the supreme court of that state took occasion to criticise the decision in *Holden* v. *Hardy*, and held contrary to the lucid opinion of the United States Supreme Court in that case, declaring that the protection of the health and lives of employees in mines and smelters was within the police power of the state, and that the Utah statute, from which ours is taken, was valid, and not objectionable as class legislation. Nor are we prepared to agree with the bald assertion in the Colorado opinion that the state may not protect the individual against injury to himself, but we do not wish to be understood as placing the decision here on such narrow ground. Under the common law the man who tries to commit suicide and fails may be punished for the attempt to take his own life. A perusal of the decision in *Re Morgan* would lead to the inference that the Utah Supreme Court was not affirmed by the Supreme Court of the United States in *Holden* v. *Hardy*, when three courts, including the latter at different times, have asserted to the contrary. The Utah constitution not only does not, but if a different construction be claimed for it, as was done in the Colorado case, it could not, as against the fourteenth amendment, to which all conflicting provisions of state constitutions, as well as statutes, must yield, convey any authority for legislation abridging the rights, privileges, or immunities of citizens, or for depriving any person of property or liberty without due process of law, or for denying to any person the equal protection of the laws. The opinion in *Re Morgan* implies

a warrant in the Utah constitution which did not exist in Colorado, as a basis of the opinion of the Supreme Court of the United States, when, under well-known elementary principles, the Utah constitution was of no more force against the federal constitution and its amendments than the Colorado statute. It was the conclusion of the court in *Re Morgan* that the statute "unjustly and arbitrarily singled out a class of persons, and imposed upon them restrictions from which others similarly situated and substantially in the same condition were exempt, and that it was not a valid exercise of the police power of the state." As we have seen, the United States Supreme Court held differently on both these propositions, when the prohibitions which may relate to them are as broad in controlling under the fourteenth amendment as under the constitution of Colorado. The conflict in these cases is evident, and it is apparent that the Colorado court had no different and substantial reason for deciding contrarily to the Supreme Court of the United States. When, as held by the highest court in the land, the power of the legislature, as applied to a similiar statute in Utah, cannot be stayed by the fourteenth amendment, we must conclude that it is not nullified by the state constitution—an instrument less potential, and not broader in its relevant guaranties.

Notwithstanding the attempt of the Supreme Court of Colorado to discredit and overrule the doctrines announced by the Supreme Court of the United States in *Holden* v. *Hardy*, the latter tribunal has continued to affirm those principles, and in later decisions has stated regarding the case:

*Orient Insurance Company* v. *Daggs*, 172 U. S. 563, 19 Sup. Ct. 283, 43 L. Ed. 552: "It is sufficient to say that there are certain immutable principles of justice which inhere in the very idea of free government, which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice and an opportunity of being heard in his defense. These principles were extended to the right to acquire property and to enter into contracts with respect to property, but it was said, 'This right of contract, however, is itself subject to certain limitations which the state may lawfully impose in the exercise

of its police duties.' The legislation sustained was an act of the State of Utah making the employment of workingmen in all underground mines and workings, and in smelters and all other institutions for the reduction and refining of ores or metals, eight hours per day, except in cases of emergency, where life or property shall be in imminent danger. The violation of the statute was made a misdemeanor. It was undoubtedly a limitation on the right of contract—that of the employer and that of the employed—enforced by a criminal prosecution and penalty on the former, and on his agents and managers. It was held a valid exercise of the police powers of the state." Citing *Holden* v. *Hardy.*

*Railway* v. *Paul,* 173 U. S. 409, 19 Sup. Ct. 421, 43 L. Ed. 746: "Inasmuch as the right to contract is not absolute, but may be subjected to the restraints demanded by the safety and welfare of the state, we do not think that conclusion, in its application to the power to amend, can be disputed on the ground of infraction of the fourteenth amendment." Citing *Holden* v. *Hardy.*

*Williams* v. *Fears,* 179 U. S. 274, 21 Sup. Ct. 129, 45 L. Ed. 186: "And so as to the right to contract. The liberty, of which the deprivation without due process of law is forbidden, 'means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned; although it may be conceded that this right to contract in relation to persons or property or to do business within the jurisdiction of the state may be regulated, and sometimes prohibited, when the contracts or business conflict with the policy of the state, as contained in its statutes.' (*Allgeyer* v. *Louisiana,* 165 U. S. 578, 589, 591 [17 Sup. Ct. 427, 41 L. Ed. 832]; *Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780.)"

In *Austin* v. *Tennessee,* 179 U. S. 369, 21 Sup. Ct. 134, 45

L. Ed. 224, a statute of that state prohibiting the importation and sale of cigarettes: "While as was said in *Holden* v. *Hardy*, 169 U. S. 366, 392 [18 Sup. Ct. 388, 42 L. Ed. 780], 'the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety, and morals, or the abatement of public nuisances; and a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what means are necessary for the protection of such interests.' Thus, while in *Railroad Company* v. *Husen*, 95 U. S. 465 [24 L. Ed. 527], it was held that a statute of Missouri, prohibiting the driving or bringing of any Texas, Mexican, or Indian cattle into the state was in conflict with the interstate commerce clause of the constitution, it was subsequently held that the introduction of diseased cattle might be prohibited altogether, or subjected to such regulations as the legislature chose to impose. (*Railway* v. *Haber*, 169 U. S. 613, 18 Sup. Ct. 488, 42 L. Ed. 878.)"

*Knoxville Iron Co.* v. *Harbison*, 183 U. S. 21, 22 Sup. Ct. 4, 46 L. Ed. 55: "In *Holden* v. *Hardy*, 169 U. S. 366 [18 Sup. Ct. 383, 42 L. Ed. 780], the validity of an act of the State of Utah regulating the employment of workingmen in underground mines, and fixing the period of employment at eight hours per day, was in question. There, as here, it was contended that the legislation deprived the employers and employees of the right to make contracts in a lawful way and for lawful purposes; that it was class legislation, and not equal or uniform in its provisions; that it deprived the parties of the equal protection of the laws, abridged the privileges and immunities of the defendant as a citizen of the United States, and deprived him of his property and liberty without due process of law. But it was held, after full review of the previous cases, that the act in question was a valid exercise of the police power of the state, and the judgment of the Supreme Court of Utah sustaining the legislation was affirmed."

*Short* v. *Mining Co.*, 20 Utah 24, 57 Pac. 721, 45 L. R. A. 603: "The statute above referred to was held constitutional by the court in *State* v. *Holden*, 14 Utah, 71 [46 Pac. 756, 37

L. R. A. 103), and the Supreme Court of the United States affirmed such decision in 169 U. S. 366 [18 Sup. Ct. 383, 42 L. Ed. 780], holding that the act in question was a valid exercise of the police power of the State of Utah."

Similar conclusions are stated in *People* v. *Lochner* (Sup.) 76 N. Y. Supp. 401.

We think the better reasoning and correct distinction are with the Supreme Court of the United States, and the cases in line with its decisions. As we have already shown, the objection to the statute as being special legislation was held to be untenable by that court, and its opinion based squarely on the fact that the legislature, in the exercise of its police power, could, by limiting the hours of labor, provide for the protection of the health of the men employed in underground mines and smelters. If the statute had been objectionable as class legislation, that court would have held it to be a denial of the equal protection of the laws under the fourteenth amendment to the federal constitution. Of necessity, many laws must refer to certain classes, such as those governing towns, cities, various occupations, of which the saloon business has been cited as an instance, quarantine laws to prevent the spread of different diseases peculiar to animals and people and different localities, safety devices; and generally a health regulation must be limited, as a matter of fact, if not in direct statutory terms, to that class which will be affected, for no others could receive protection. It is necessary that the law affect all persons alike in the same class and under similar conditions. These requirements are met by the statute, for it controls all alike, and extends to every man who engages in underground mining, or in the smelting and milling of ores, and becomes subject to the dangers incident to those occupations. In sustaining a statute requiring the closing of saloons between 12 at night and 6 o'clock in the morning, this court said: "The act is not local or special, in the sense of the constitutional restriction upon this subject. It applies to all saloons and gaming houses throughout the state which come within the class mentioned in the act, and, as to such classes and places of business, it is of uniform operation throughout the state." (*Ex Parte Livingston*, 20 Nev. 289, 21 Pac. 322.)

In *Wenham* v. *State*, 91 N. W. 421, 58 L. R. A. 825, the Supreme Court of Nebraska held that an act prohibiting females from laboring more than ten hours per day, or sixty hours per week, in manufacturing and certain other establishments, was within the police power of the state, and not objectionable as class legislation; and it is said in the opinion: "It would seem at first blush as though a law having the effect to interfere with the business of the one, or shorten the hours of labor of the other, would be repugnant to these constitutional provisions. It must be conceded, however, that every property holder is secured in his title thereto, and holds it under the implied rule and understanding that its use may be so regarded and restricted that it shall not be injurious to the equal enjoyment of others having the equal right to the enjoyment of their property, or to the rights of the community in which he lives. All property in this state is held subject to rules regulating the common good and the general welfare of our people. This is the price of our advanced civilization, and of the protection afforded by law to the right of ownership, and the use and enjoyment of the property itself. Rights of property, like other social and conventional rights, are subject to reasonable limitations in their enjoyment, and to such reasonable restraints and regulations by law as the legislature, under the governing and controlling power vested in them by the constitution, may think expedient."

To the same effect, and upholding a similar statute, is *State* v. *Buchanan*, 70 Pac. 52, 59 L. R. A. 342, a Washington case.

It may be assumed that, at the time of the adoption of our state constitution, underground mining had not progressed to such extent that the dangers to health incident were so apparent and well understood as to-day, and consequently that no provision was made for or against such legislation as that before us, and no consideration given the subject. Time and the light of experience and the progress of the age have shown the desirability of various enactments for the promotion of the happiness and good of the people, regarding which legislators and statesmen were formerly unmindful. As new conditions and necessities arise in the affairs of men, the law must advance to meet them.

For the reasons indicated, we conclude that it was within the power and discretion of the legislature to enact the statute for the protection of the health and prolongation of the lives of the workingmen affected, and the resulting welfare of the state.

The petitioner is remanded to custody.

FITZGERALD, J., concurring:

The question for determination is, does the eight-hour enactment of the last session of the Nevada Legislature violate the Nevada constitution? True, it is claimed in the brief of counsel for petitioner that the said enactment violates also the constitution of the United States, in its fourteenth amendment, but this contention was abandoned at the oral argument; and the Supreme Court of the United States, which is the supreme authority as to what may constitute a violation of that constitution, has held that such an enactment does not contravene the national constitution.

Counsel claim that the enactment violates the constitution of Nevada (1) in section 21 of article IV, as to generality and uniformity of laws; (2) in section 17 of article IV, as to multiplicity of subjects; (3) in section 20 of article IV, as to local and special laws; and (4) in section 1 of article I, as to (a) class legislation; and (b) its "Bill of Rights," as to, first, personal liberty; and, second, as to acquiring property.

While counsel have cited the foregoing sections as violated by the enactment in question, they have not, in their arguments, kept the discussion on each point separate; but several points are mingled together in their discussion. Hence the discussion here will have, to some extent, to follow the same method. The said points will, however, be separately discussed as far as, under the circumstances, may be practicable.

Section 20 of article IV provides: "The legislature shall not pass local or special laws" in certain cases therein named; but the enactment in question here does not seem to come under any of them, unless it be this one: "For the punishment of crimes and misdemeanors." If that be the contention, it will receive attention further on.

Section 21 provides that "in all cases enumerated in the preceding section [see section 20] and all other cases where a general law can be made applicable, all laws shall be general· and of uniform operation throughout the state." Does counsel claim that a health law could "be made general and of uniform operation throughout the state"; that is, applicable to wholesome and unwholesome employments alike, if there are employments wholesome and employments unwholesome? If so, cases cited in the briefs oppose the contention.

· Section 17 of article IV is: "Each law enacted by the legislature shall embrace but one subject, and matter properly connected therewith, which subject shall be briefly expressed in the title," etc. The title of this act is as follows: "An act regulating the hours of employment in underground mines and smelters, and ore reduction works, and providing penalties for violation thereof." Does this enactment violate this section as being multifarious in its title? Counsel, though citing the section as violated by the act's title, pay very slight attention to the point in their argument. This fact and the subject itself justify only a brief reference to it here. It is thought that neither the title nor the body of the act violates said section.

This ·brief reference to the sections of the constitution claimed to be violated is made to show that all that were cited to the court by counsel received the court's attention. The main contention of counsel will now be considered: Section 1 of article I, called by counsel the "Bill· of Rights," is: "All men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness." The contention is that the enactment of 1903 violates this section, as (1) interfering with petitioner's "liberty," (that is, his "liberty to contract"); and (2) his right of "acquiring * * * property." These are the two precise questions in this case. And here, too, counsel have not chosen to discuss each point separately, but have mingled them together in a general manner. Therefore the brief discussion here to be made will be somewhat similar. One remark, however,

will be made, to wit, that although courts of great respect-
ability have, it seems, held that the word "liberty," in other
constitutions similar to ours, in said section 1 of article I,
refers to the "right to contract" or "liberty to contract," is
it, after all, entirely clear that it does? It would seem that
the notion conveyed by the word "liberty" might ordinarily
be deemed to be somewhat different from the word "con-
tract," and also the "right to liberty" and the "right to con-
tract" somewhat different from each other. But be that as
it may, now to the points thus sharply put to issue:

The question presents itself in two aspects: (1) Its gen-
eral aspect (that is, in reference to legislative enactments
upon the right or liberty of all citizens "to contract in refer-
ence to their labor," and the right of all citizens to "acquire
property"); and (2) the rights of a special class or special
classes of citizens in these respects. The first or general
aspect of the question does not arise in the matter now in
hearing, and therefore will not be discussed. But the second
aspect, to wit, the special one of the legislative power to regu-
late or restrain contracting as to laboring in underground
mines and about smelters and reduction works, does arise,
and will be considered.

On the specific question of such regulation and restraint
as to laboring in underground mines and about smelting and
reduction works but two cases have been cited by counsel.
These are the case of *State* v. *Holden*, 14 Utah, 71, 46 Pac.
756, 37 L. R. A. 103, and the case of *In re Morgan*, 26 Colo.
415, 58 Pac. 1071, 47 L. R. A. 52, 77 Am. St. Rep. 269: and
these two cases are directly antagonistic to each other. True,
in addition to these two cases there are in Colorado (*In re
Labor Bill*, 21 Colo. 29, 39 Pac. 328, and *In re House Bill*,
21 Colo. 32, 39 Pac. 431) judicial responses to legislative
inquiries to the same effect as was the decision of the Colo-
rado court in *In re Morgan*. But those responses were not
made after argument by counsel, and do not themselves con-
tain argument, but merely assertion. Therefore the case in
*In re Morgan* is essentially, as stated above, the only case in
point cited by counsel that was precisely antagonistic to the
case cited from Utah.

Before considering these cases, let it be remarked that the

legislative power to regulate and restrain the hours of labor
in employments other than those mentioned in the Nevada
statute has been before numerous appellate courts of the
Union, and that the decisions thereon are not uniform; some
holding such regulation and restraint constitutional, and
others unconstitutional. Therefore whatever aid could be
gained from analogy in decisions in other cases would be
divided aid—partly in favor of petitioner, and partly against
him; but it is believed the preponderance in number and
reason is against him.

As counsel for petitioner place great reliance on *In re
Morgan*, that case will be examined. Here a puzzling state-
ment appears. The chief justice in the opinion first gives
the enactment of the Colorado Legislature in question in the
case, which is the same as the one in question in the Utah
case, and also in the case now before us; and, secondly, the
clause of the Colorado Constitution claimed to be by it
violated, which clause is essentially the same as the clause
in the Nevada Constitution, and also as the clause in the
Utah Constitution (it is not here overlooked that another
clause is in the Utah Constitution enjoining upon its legis-
lature the enactment of health laws as to laborers in mines,
etc.); and then he says that it is "practically admitted to be
true that this act contravenes the constitutional provision
quoted in the statement. Let us see if, notwithstanding this
conflict, it can be justified as a valid exercise of the police
power." Curious admission. If admitted, it must have been
by the counsel in the case who were endeavoring in their
arguments to uphold the enactment of the Colorado Legisla-
ture; and, after admitting that the enactment contravened
the constitution, how could counsel, in reason, ask the court
to uphold such contravening enactment, under either the
police power or under any other power of the legislature?
If the enactment contravened the Colorado Constitution, it
would seem that was an end of the matter. Saying or assum-
ing that it did so violate was a *petitio principii*. It begged
the whole question.

Again the Colorado court in *In re Morgan*, says: "If, in
our constitution there was, as there seems to be in that of
Utah, a specific affirmative provision enjoining upon the

general assembly the enactment of laws to protect the health of the class of workingmen therein enumerated, it might be that acts reasonably appropriate to that end would not be obnoxious to that provision of our constitution forbidding class legislation, for it could hardly be said that a classification made by the constitution itself was arbitrary or unfair, or that it clashed with another provision of the same instrument inhibiting class legislation."

Why could not a classification made by a constitution be "arbitrary" and "unfair"? Clearly such classification might in reality be arbitrary and unfair, but it probably would not lie in the mouths of justices constituting a court under such constitution to nullify it because of such arbitrariness and unfairness.

In the paragraph just above quoted does not the Colorado court—that court so much relied upon by those assailing the enactment in question in this court—practically admit that such an enactment as this is a "reasonably appropriate" health regulation? It was only the "health" of the workmen that the Utah Constitution commanded its legislature to enact laws to protect. It did not say how this health was to be protected. The Utah Legislature deemed protection of miners by regulating and controlling the hours of daily labor "reasonably appropriate" protection, and the Utah Supreme Court likewise held it "reasonably appropriate" and valid. It may be added here that the United States Supreme Court also has held such legislation appropriate and valid. (See infra.)

Now, in essence, precisely the same situation existed in Colorado at the time of the decision in *In re Morgan* as did in Utah at the time of the decision in *State* v. *Holden*, and as does now in this state. By universal consent of courts and text-writers on the law, the legislature has, without express constitutional grant authorizing it, the power to protect the health of the people over whom it has jurisdiction. Therefore, as a question of legislative power, there is not a particle of difference, in essence, between the situation under the Utah Constitution and that under the Colorado and the Nevada Constitutions. And the question here is purely one of legislative power. The expediency, propriety, or wisdom

of the enactment is not before this court.   If the legislature has the constitutional power to make the enactment, this court has no power to annul the enactment; and should it, under the case supposed, do so, it could be justly charged with usurpation of power.   And courts, the conservating governmental branch under the constitution or fundamental principles of government, should be most careful not themselves to set the example of usurping power.   Let it, however, be said that courts should be equally scrupulous and fearless in preventing others from infractions upon the constitution which they are sworn to support, protect, and defend.   Then, under the direct decision of the Utah Supreme Court that an eight-hour law is a reasonably appropriate provision to protect the health of those engaged in underground mining, and those in and about smelting and reduction works, and the pregnant admission of the Colorado Supreme Court to the same effect, and, again, the direct affirmance of the same doctrine by the Supreme Court of the United States in the following cases in that court:   *Holden* v. *Hardy*, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780; *Orient Insurance Company* v. *Daggs*, 172 U. S. 564, 19 Sup. Ct. 281, 43 L. Ed. 552; *St. Louis Iron Mountain & Railway* v. *Paul*, 173 U. S. 409, 19 Sup. Ct. 419, 43 L. Ed. 746; *Williams* v. *Fears*, 179 U. S. 274, 21 Sup. Ct. 128, 45 L. Ed. 186; *Austin* v. *Tennessee*, 179 U. S. 349, 21 Sup. Ct. 132, 45 L. Ed. 224; and *Knoxville Iron Co.* v. *Harbison*, 183 U. S. 21, 22 Sup. Ct. 1, 46 L. Ed. 55— what of precedent there is in the decisions of other courts is in favor of the validity of the law.

It cannot be said that these decisions of the United States Supreme Court were obiter.   They were necessary to the decision of the cases.   The contention was that the Utah enactment was in violation of the fourteenth amendment to the United States Constitution, as (1) abridging the privileges and immunities of citizens of the United States; (2) depriving persons of liberty and property without due process of law; and (3) denying persons within its jurisdiction the equal protection of the laws.   The court held, in effect, that the Utah enactment did no one of these three things. Why?   Because it was a legitimate police regulation.   Why a legitimate police regulation?   Because it was based on a

consideration of health; that laborers in underground mines and those in smelters could reasonably and properly be made into a class, and the health of that class protected by legislative enactment. Had the foundation been imaginary, the court could not have so held. But the foundation (that is, the consideration of health) being real, proper and reasonable, the court logically and legally upheld the enactment. The fourteenth amendment was violated unless the enactment was a legitimate police regulation, and it was not a legitimate police regulation unless the enactment was based on a legitimate health classification. Therefore the United States Supreme Court directly holds this to be a legitimate health regulation. I cannot say that I am so fully and completely equipped in the doubtful science of medicine as to be able to say that I know that it is not such a reasonably appropriate provision. This is the full extent to which it is necessary to go in this case. Then, too, not a decision of a court that mentions the subject but says that a court cannot set aside an enactment of a legislature unless the enactment is, beyond doubt, in violation of the constitution under which both the court and the legislature act. Can it be said that, under the showing above made, there is not a doubt that the enactment in question here is beyond all doubt in violation of the constitution of the State of Nevada? It seems to me that it cannot be so said. Therefore I conclude that this enactment is not unconstitutional as being a violation of the "health" element of the Nevada Bill of Rights.

Now to the "class legislation" element in the enactment: Counsel, in their arguments in this case, have mingled the "class legislation" objection implied, they say, in the bill of rights, and the "class legislation" inhibited in subsequent parts of the constitution, to wit, sections 20 and 21 of article IV, and perhaps it may be permissible for me to do the same. Here it cannot truly be said that all class legislation is bad. Decisions by the hundred and by the thousand may easily be found that hold some class legislation is constitutional and valid. Such are too numerous to need citation of instances. The only question is, is there, or is there not, a real foundation—a foundation in fact, in the nature of things—for the class made? If there is such a foundation to support a legis-

lative enactment, then that enactment is constitutional and valid; but, if not, then it is unconstitutional, and therefore void. Should legislators so far forget their duty to God and to man, and so far disregard the oath of office taken by them to support, protect, and defend the constitution—the only instrument that gives them any power to act at all legislatively—as to join together in an enactment persons or things on a mere imaginary something that has no existence in the natures or situations of those persons or those things, and say that those persons or those things must be governed by said enactment, then it would be class legislation; and at least contrary to sections 20 and 21, above mentioned, and possibly, also, to the bill of rights, in section 1 of article I. But of the latter I do not desire at this place to discourse. For does it not seem that when provision so ample against class legislation, local and special, as that contained in sections 20 and 21 of article IV of the Nevada Constitution, is made, the inhibitions of the bill of rights, in section 1 of article I, were aimed at other evils? Be that as it may, I conclude that the enactment of the Nevada Legislature in question here is not in violation of the Nevada Constitution, as being "class legislation" of the objectionable kind inhibited in section 20 or 21, or of the objectionable kind that may possibly be inhibited in the bill of rights of section 1 of article I, if there be therein any such inhibition.

In support of this conclusion may be cited the direct decision of the Utah Supreme Court that workers in underground mines and workers in smelters and reduction works may with sound reason be made into classes, and the health of those classes protected by the legislature. To the same effect is impliedly the decision of the court most relied on in argument here, to wit, the Colorado Supreme Court, in *In re Morgan*. For I think I have above shown that the opinion in the Colorado case impliedly, at least, admits that, with a constitutional provision like that in the Utah Constitution, such legislation might be valid, and also further shown that, in essence, the additional provision of the Utah Constitution did not at all change the situation. True, the Colorado court held such legislation unconstitutional and void; but it would seem that after the facts stated, and after the admissions made

by it, its conclusion against the validity of the enactment before it was a *non sequitur*.

In addition, as stated above, I cannot say that my knowledge of medical science is so complete that I can, in conscience, say that I know that workers in underground mines or workers in smelters and reduction works are not engaged in unhealthy employments. The legislature of Nevada, at its session in 1903, impliedly said they were such, and legislated for the protection of such workers; and I cannot, under the reason of the thing, and the authority of the Utah Supreme Court and that of the United States Supreme Court, to say nothing of the pregnant admission of the Colorado Supreme Court (may I be permitted to explain that I mean an admission that is pregnant with a principle that is destructive of the final conclusion to which that court came?), say that the said enactment of the Nevada Legislature for that purpose was, beyond doubt, a violation of the constitution of Nevada.

For the foregoing reasons I concur in the conclusion of Justice TALBOT that the enactment in question here is not a violation of the constitution of Nevada, and also in the order that the petitioner be remanded to custody.

BELKNAP, C. J., dissenting:

It is claimed that the law should be upheld as a health law, and was adopted for that purpose by the legislature in its exercise of the police power. The police power is inherent in the legislature, and founded upon the duty of the state to protect life, health, and property of the community, and to preserve good order and morality. Professor Tiedeman, in his treatise upon the subject, says: "The police power of the government, as understood in the constitutional law of the United States, is simply the power of the government to establish provisions for the enforcement of the common as well as civil law maxim, '*Sic utere tuo, ut alienum non lædas.*'"

This police power of the state extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state. According to the maxim, "*Sic utere tuo, ut alienum non lædas,*" it being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in

which every one may use his own as not to injure others.

In *Lawton* v. *Steele*, 152 U. S. 136, 14 Sup. Ct. 500, 38 L. Ed. 385, the court said: "The extent and limits of what is known as the 'police power' has been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the state may order the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane, or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the state may interfere whenever the public interests demand it; and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations."

*In the Matter of Jacobs*, 98 N. Y. 98, 50 Am. Rep. 636, where the court had under consideration a law of New York

prohibiting the manufacture of cigars and the preparation of tobacco in any form in tenement houses, after citing decisions to show that the police power is not without limitation, and that in its exercise the legislature must respect fundamental rights guaranteed by the constitution, it said:   "If this were otherwise the power of the legislature would be practically without limitation.   In the assumed exercise of the police power in the interests of the health, the welfare, or the safety of the public, every right of the citizen might be invaded, and every constitutional barrier swept away.   Generally it is for the legislature to determine what laws or regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient, and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts.   But they must have some relation to these ends. Under the guise of police regulations, personal rights and private property cannot be arbitrarily invaded, and the determination of the legislature is not final or conclusive.   If it passes an act ostensibly for the public health, and thereby destroys or takes away the property of a citizen, or interferes with his personal liberty, then it is for the courts to scrutinize the act and see whether it really relates to, and is convenient and appropriate to promote, the public health. *   *   *   To justify this law, it would not be sufficient that the use of tobacco may be injurious to some persons, or that its manipulation may be injurious to those who are engaged in its preparation and manufacture, but it would have to be injurious to the public health."   Again:   "When a health law is challenged in the courts as unconstitutional, on the ground that it arbitrarily interferes with personal liberty and private property without due process of law, the courts must be able to see that it has, at least, in fact, some relation to the public health; that the public health is the end actually aimed at; and that it is appropriate and adapted to that end."

To justify the law, it is not sufficient that underground mining and working in smelters may be injurious to the men employed in the mines or smelters, but it must be injurious to the public health.   It is not claimed that the law is injurious in this respect.   If this law is beneficial to the

men working in underground mines and smelters—and that
is insufficient, under the authorities—it is so only in a
remote degree.   Rheumatism, miners' consumption, and lead
poisoning, it is said, are the maladies to which men affected
by this law are exposed.   It is difficult to understand how
these afflictions may be prevented by its provisions.   Lead
poisoning and miners' consumption are caused by inhaling
fumes from the smelters, or dust in the deep mines.   Any
daily exposure for a materially less time than eight hours
may result in their contraction.   In its most favorable
aspect, the statute is not helpful to these men, except that
shorter hours of labor tend to preserve the system, while
longer hours produce exhaustion and its consequent ill effects.
I think the statute was adopted by the legislature in con-
formity to the trend of legislation throughout the country,
shortening the hours of labor in many industrial pursuits,
and not as a health regulation.

The principle upon which the police power is exercised by
the legislature is based upon the maxim, "So use your own
as not to injure others," the literal transaction of which is,
"Enjoy your own property in such a manner as not to injure
that of another person."   (Broom's Legal Maxims, p. 364.)
"Any law which goes beyond that principle—which under-
takes to abolish rights, the exercise of which does not involve
an infringement of the rights of others, or to limit the
exercise of rights beyond what is necessary to provide for
the public welfare and personal security—cannot be included
in the police power of the government.   It is a governmental
usurpation, and violates the principles of abstract justice, as
they have been developed under our republican institutions."
(Tiedeman, sec. 1.)   The maxim can only be invoked in the
support of laws for the protection of the public health, and
not for the protection of an individual against himself.   There
can be no more justification for such a law than laws pro-
hibiting men from working in the manufacture of white lead,
because they are apt to contract lead poisoning, or to pro-
hibit occupation in certain parts of iron smelting works,
because the lives of men so engaged are materially shortened.
(Tiedeman, sec. 86.)

In the case of *In re Morgan*, 26 Colo. 426, 58 Pac. 1071,

47 L. R. A. 52, 77 Am. St. Rep. 269, a statute similar to
the one now under consideration was held unconstitutional.
After determining that the statute violated the bill of rights,
which guarantees to all persons the natural rights of acquir-
ing, possessing, and protecting property, the court proceeded,
in an admirable discussion, to the consideration of the ques-
tion whether the law was a proper exercise of the police
power to protect the public health, as follows: "Were the
object of the act to protect the public health, and its provi-
sions reasonably appropriate to that end, it might be sus-
tained, for in such a case even the constitutional right of
contract may be reasonably limited.  But the act before us
is not of that character.  In selecting a subject for the exer-
cise of the police power, the legislature must keep within its
true scope.  The reason for the existence of the power rests
upon the theory that one must so use his own as not to injure
others, and so as not to interfere with or injure the public
health, safety, morals, or general welfare.  How can one be
said injuriously to affect others or interfere with these great
objects by doing an act which confessedly visits its conse-
quences on himself alone?  And how can an alleged law that
purports to be the result of an exercise of the police power
be such in reality, when it has for its only object not the
protection of others, or the public health, safety, morals, or
general welfare, but the welfare of him whose act is pro-
hibited, when, if committed, it will injure him who commits
it, and him only?  *  *  *  In this we must not be under-
stood as limiting the legislature where the facts justify
apparent discrimination in passing the health laws affecting
only certain classes.  Indeed, laws having for their object the
protection of small portions of a community have been upheld,
as in *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659 [24 L. Ed.
1036], when a nuisance, obnoxious probably only to a part of
a village, was abated; but what we mean to decide is that in
a purely private lawful business, in which no special privi-
lege or license has been granted by the state, and the carry-
ing on of which is attended by no injury to the general
public, it is beyond the power of the legislature, under the
guise of the police power, to prohibit any adult man who
desires to work thereat from working more than eight hours

a day, on the ground that working longer may, or probably
will, injure his own health."

*Holden* v. *Hardy*, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed.
780, a decision of the Supreme Court of the United States,
in which a statute of the State of Utah similar to the one
now under consideration was upheld as not being in conflict
with the provisions of the fourteenth amendment to the con-
stitution of the United States, is referred to as an author-
itative ruling in support of the law.    The constitution of the
State of Utah (article XVI, sec. 6) declares, among other
things, "that the legislature shall pass laws to provide for
the health and safety of employees in factories, smelters and
mines," and further provides, in the succeeding sections,
that "the legislature by appropriate legislation shall provide
for the enforcement of the provisions of this article."

In *Holden* v. *Hardy*, it is said:    "The Supreme Court of
Utah was of opinion that, if authority in the legislature
were needed for the enactment of the statute in question, it
was found in that part of article XVI of the constitution of
the state which declared that the legislature shall pass laws
to provide for the health and safety of employees in factories,
smelters, and mines."    We have no such constitutional pro-
vision, and for this reason the case of *Holden* v. *Hardy* is
inapplicable as an authority here.    The only question in that
case was whether the statute of Utah violated the provisions
of the fourteenth amendment to the constitution of the United
States, and the consideration in the opinion of the question
of the extent to which the police power may be exercised
under the provisions of the state constitution was not a fed-
eral question, and therefore without the jurisdiction of that
court, but was one to be determined only by the courts of
the State of Utah.

In *People* v. *Budd*, 117 N. Y. 1, 22 N. E. 670, 682, 5 L. R.
A. 559, 15 Am. St. Rep. 460, Judge Peckham said: "In mat-
ters pertaining to its proper construction [the constitution of
the State of New York], our decision is final, excepting that
if, as construed by us, the constitution or our laws deny the
existence of some right or privilege claimed by a party by
virtue of the federal constitution or laws, our decision is
reviewable by the federal court, not for the purpose of

reviewing our construction of our constitution or laws, but to see whether, under the constitution or laws as construed by us, any right or privilege existing by virtue of the federal constitution or laws has been violated or denied, and, if so, to give it effect notwithstanding the state law or constitution."

In *Barbier* v. *Connolly*, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923, Judge Field said: "In this case we can only consider whether the fourth section of the ordinance of the city and county of San Francisco is in conflict with the constitution and laws of the United States. We cannot pass upon the conformity of that section with the requirements of the constitution of the state. Our jurisdiction is confined to the federal question involved."

In the Morgan case, *supra*, the Supreme Court of Colorado was urged to follow the decision in the Holden-Hardy case, as controlling upon it. After fully considering that decision, and conceding that in the construction of federal questions it is the duty of state courts to be governed by the decisions of the Supreme Court of the United States, the court said: "If the language used by that august tribunal in *Holden* v. *Hardy* is to be understood as limiting or defining how far a state legislature may go in the exercise of the police power without transcending any of the limits prescribed by the federal constitution, we agree with counsel for petitioner that it was needful to the ascertainment of the question before the court. But if it is not to be thus restricted, and if it was employed with the view of determining what are the true limits of the police power of a state under the provisions of the constitution of that state, the remarks in that connection are wholly obiter, and not authority in that court itself, much less in any other jurisdiction. (*Wadsworth* v. *U. P. Railway Co.*, 18 Colo. 610 [33 Pac. 515, 23 L. R. A. 812, 36 Am. St. Rep. 309]; *Carroll* v. *Carroll's Lessee*, 16 How. 275 [14 L. Ed. 936]: 2 Black on Judgments, sec. 611.)"

Section 1 of article I of the constitution of this state declares: "All men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness." Substantially the same principles

are embodied in the Declaration of Independence and in the constitutions of the states. "Among these inalienable rights, as proclaimed in the Declaration of Independence," said the Supreme Court of the United States in *Butcher Union Co.* v. *Crescent City Co.*, 111 U. S. 757, 4 Sup. Ct. 660, 28 L. Ed. 285, "is the right of men to procure their happiness, by which is meant the right to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties so as to give them their highest enjoyment. The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must therefore be free in this country to all alike upon the same conditions. The right to pursue them without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright. It has been well said that, 'the property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.' (Adam Smith's Wealth of Nations, bk. 1, c. 10.)"

In the same case Bradley, J., said: "I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States," of which he cannot be deprived without invading his right to liberty, within the meaning of the constitution. And again: "There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more or less

than the sacred right of labor." (*Live Stock Assn.* v. *Crescent City Co.*, 1 Abb. (U. S.) 399, Fed. Cas. No. 8408.)

In *People* v. *Gillson*, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465, the court said: "The following propositions are firmly established and recognized: A person living under our constitution has the right to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit. The term 'liberty,' as used in the constitution, is not dwarfed into mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. 'Liberty,' in its broad sense, as understood in this country, means the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation."

In *Ritchie* v. *People*, 155 Ill. 101, 40 N. E. 457, 29 L. R. A. 79, 46 Am. St. Rep. 315, the court, in considering a statute similar in principle, said: "It substitutes the judgment of the legislature for the judgment of the employer and employee in a matter about which they are competent to agree with each other. It assumes to dictate to what extent the capacity to labor may be exercised by the employee, and takes away the right of private judgment as to the amount and duration of the labor to be put forth in a specified period. When the legislature thus undertakes to impose an unreasonable and unnecessary burden upon any one citizen or class of citizens, it transcends the authority intrusted to it by the constitution, even though it imposes the same burden upon all other citizens or classes of citizens. * * * Liberty, as has already been stated, includes the right to make contracts as well with reference to the amount and duration of labor to be performed as concerning any other lawful matter. Hence the right to make contracts is an inherent and inalienable one, and any attempt to unreasonably abridge it is opposed to the constitution."

My conclusion is that the constitutional right of employer

and employee is destroyed by the express terms of the act, in this: that its provisions undertake to prevent employer and employee from making their own contracts concerning underground mining and work in smelters, or in any institution or place for the reduction or refinining of ores or metals, and that it is not a valid exercise of the police power, as a health regulation.

I therefore dissent from the judgment of the court.